174 A.3d 987

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. WILLIAM BURKERT, DEFENDANT-RESPONDENT.

A–6 Sept.Term 2016
077623

Argued September 11, 2017—Decided December 19, 2017

258

Sarah Lichter, Deputy Attorney General, argued the cause for appellant (Christopher S. Porrino, Attorney General, attorney; Sarah Lichter, of counsel and on the briefs).

Steven J. Kaflowitz argued the cause for respondent (Caruso Smith Picini, attorneys; Steven J. Kaflowitz on the briefs and Timothy R. Smith, of counsel and on the briefs).

Edward L. Barocas argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Edward L. Barocas, Legal Director, and Rutgers Constitutional Rights Clinic Center for Law & Justice, attorneys; Edward L. Barocas, Jeanne M. LoCicero, Alexander R. Shalom, and Ronald K. Chen, of counsel and on the brief).

J. Gregory Crane and Eugene Volokh of the California bar, admitted pro hac vice, submitted briefs on behalf of amicus curiae Pennsylvania Center for the First Amendment (Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, attorneys; J. Gregory Crane and Eugene Volokh, on the briefs).

JUSTICE ALBIN delivered the opinion of the Court.

The free-speech guarantees of our Federal and State Constitutions safeguard not only polite and decorous conversation and debate but also speech that we hate—speech that is crude, obnoxious, and boorish. A commitment to free discourse requires that we tolerate communication of which we strongly disapprove. This case tests the limits to which a broadly worded harassment statute can criminalize speech.

William Burkert and Gerald Halton were corrections officers, who held positions in different unions representing distinct classes of corrections officers. Their relationship became particularly strained after Burkert read online comments attributed to Halton's wife that Burkert felt insulted him and his family. In response, Burkert downloaded a wedding photograph of Halton

and his wife that was posted on social media and then inscribed degrading and vile dialogue on copies of the photograph. Copies of those photographs were found strewn in the employee parking garage and locker room of the Union County Jail.

Halton filed three complaints in municipal court charging Burkert with harassment in violation of N.J.S.A. 2C:33–4(c), which makes it an offense to have engaged in a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy [a] person." Halton's private attorney prosecuted this quasi-criminal offense on behalf of the State while Halton contemporaneously pursued a civil action against Burkert. A municipal court judge found Burkert guilty of harassment on two of the complaints, as did a Law Division judge after a trial de novo on the record.

The Appellate Division vacated Burkert's conviction, determining that although the flyers were wholly unprofessional and inappropriate for the workplace, they did "not amount to criminal harassment" in light of our constitutional free-speech guarantees.

We affirm. Criminal laws targeting speech that are not clearly drawn are anathema to the First Amendment and our state constitutional analogue because they give the government broad authority to prosecute protected expressive activities and do not give fair notice of what the law proscribes. Such laws also chill permissible speech because people, fearful that their utterances may subject them to criminal prosecution, may not give voice to their thoughts.

To ensure that N.J.S.A. 2C:33–4(c) does not exceed its constitutional reach in cases involving the prosecution of pure speech, repeated acts to "alarm" and "seriously annoy" must be read as encompassing only repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy. We consider that approach to be faithful to the legislative purpose in enacting subsection (c) of N.J.S.A. 2C:33–4 and consonant with the constitutional guarantees of free speech.

Burkert's intent to annoy was not a crime, and he did not engage in the type of repetitive acts contemplated by the statute. Therefore, Burkert is not guilty of a petty disorderly persons offense, although he may be subject to workplace discipline or a civil tort action. The language on the flyers, despite its vulgarity and meanness, is constitutionally protected from a criminal prosecution for harassment.

We therefore affirm the judgment of the Appellate Division, which dismissed the charges against Burkert.

I.

A.

On September 30, 2011, Halton filed three separate complaints, alleging that Burkert committed the petty disorderly persons offense of harassment on January 8, 9, and 11, 2011, in violation of N.J.S.A. 2C:33-4(c).[1] A three-day trial was held in the Elizabeth Municipal Court. Halton's privately retained attorney prosecuted the case on behalf of the State.[2]

At trial, Halton and Burkert testified, as did two other corrections officers. The testimony, much of which was undisputed, elicited the following.

---

[1] A petty disorderly persons offense is punishable by up to thirty days in jail. N.J.S.A. 2C:43-8.

[2] Our court rules do not permit an attorney to appear as a private prosecutor on behalf of the State, except in cases involving cross-complaints, and then only on motion to the municipal court after review of "an accompanying certification submitted on a form approved by the Administrative Director of the Courts." R. 7:8-7(b). No objection was made to Halton's attorney acting as the prosecutor in the municipal court. After the conclusion of the municipal court proceedings, the Union County Prosecutor's Office represented the State in all matters concerning this case. Going forward, our municipal courts must strictly enforce Rule 7:8-7(b), which has the beneficent purpose of ensuring that quasi-criminal actions brought in the name of the State proceed in a disinterested manner.

As of January 2011, Halton and Burkert had both worked as Union County correctional officers for more than twenty years. Halton served as a sergeant and also as the vice president of the Fraternal Order of Police (FOP), a union representing high-ranking corrections officers. Burkert served as a corrections officer and also as the treasurer of the Policemen's Benevolent Association (PBA), a union representing rank-and-file corrections officers. The rivalry between those two unions evidently caused friction in their personal relationship. The tension became much more acute when Burkert learned that Halton's wife was posting derogatory comments about him and his family on a public internet forum. Halton's wife referred to Burkert and his two brothers—who also were corrections officers—as bullies. According to Burkert, the postings also described him as "fat" and one of his brothers as "quirky" and "kind of retarded."

Angered by the insulting online comments, Burkert retaliated. Burkert downloaded the Haltons' wedding photograph, which Halton's wife apparently had posted on a social media website. He then copied the photograph and made two flyers, writing lewd dialogue in speech bubbles over the faces of the bride and groom. On Flyer # 1, over Halton's face were the words, "I know I'm a pussy with a little dick. Don't do the inmates please Laura," and over his wife's face were the words, "I wish you had a cock like the inmates." On Flyer # 2, over Halton's face, the writing stated, "Fam, I got me another whore." According to Halton, "fam" is a term denoting the corrections officers as family, and the dialogue on the flyers obliquely referenced his prior wife, a former corrections officer who he claimed had relations with another officer and an inmate.

Halton testified that on January 8, 2011, at approximately 10:45 p.m., he arrived at the employee garage of the Union County Jail, parked his vehicle, and saw papers "blowing all over the place." He picked one up and discovered Flyer # 1. Halton was offended and humiliated by the scurrilous writing over his wedding photograph. As he approached the gun locker area, Burkert and his

brother, Sergeant Kevin Burkert, stood in his path. As he walked between them, Halton asked, "What's up," and Burkert replied, "You're what's up." Later, while Halton was working at the booking area, he received a call from Burkert. During their conversation, Burkert mentioned that Halton's wife had called him fat; Halton denied having any knowledge of it. When asked, Burkert denied knowing about the flyers. The conversation came to an inconclusive end.

The next day, January 9, when Halton arrived at work, a sergeant handed him Flyer # 2, which the sergeant had found in the area of the officers' locker room. Halton identified the handwriting on both flyers as Burkert's.

On January 11, while Halton was off his usual schedule and engaged in union negotiations for the FOP, a lieutenant handed him Flyer # 2, stating, "This came out the other night." The flyer was the same one turned over to Halton two days earlier.[3] Halton indicated that he "was a mess in negotiations," went home, and never returned to work. Halton explained that he felt embarrassed and concerned for his safety and received psychological counseling and treatment. He received workers' compensation benefits for this work-related injury and retired on November 1, 2011. Halton acknowledged that he did not know who was responsible for placing the flyers in the various locations.

Ten months after the January incidents, Halton filed the criminal harassment charges. Halton stated that he filed the charges only because the county had failed to properly discipline Burkert.[4] He also filed a civil lawsuit against Burkert.

█ During the county's investigation into the flyers, Sergeant Stephen Pilot interviewed Burkert. Sergeant Pilot advised Burkert that a refusal to give a statement would jeopardize his

---

[3] Lieutenant Patricia Mauko testified that she found twenty to thirty copies of one of the flyers during a routine inspection of the corrections officers' locker room on January 11.

[4] Burkert received a work-imposed suspension for his conduct.

employment. Burkert admitted to Pilot that he had prepared the flyers but denied circulating them.[5]

Burkert testified that he had been friends with Halton and became angry when he discovered that Halton's wife had been posting insulting comments about him and his brothers on a website for more than two years. While on the website, Burkert clicked a link to the wife's screen name, and the Haltons' wedding photograph appeared. He admitted downloading the photograph, inscribing the bubble dialogue over the Haltons' faces, and attaching the two flyers to the wall behind his desk in his union office. He denied, however, circulating the flyers that were later discovered in the garage and locker room. According to Burkert, on the evening of January 8, after the telephone conversation earlier described by Halton, he went to see Halton and said, "Here. I made the pictures. This is payback for what you did to my family." Burkert explained that he expressed himself through the flyers rather than "get physical with the guy." Burkert retired as a corrections officer in September 2012.

No testimony was elicited that Burkert worked either on January 9 or 11, 2011.

The municipal court entered a guilty verdict against Burkert for harassing Halton on January 8 and 11 in violation of N.J.S.A. 2C:33–4(c).[6] The court found that Burkert made and circulated the

---

[5] At trial, Burkert claimed that the admission of his statement violated Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The Garrity rule generally stands for the proposition that a statement taken from a public employee, threatened with termination from employment if he refuses to cooperate, is inadmissible in a criminal prosecution on the ground that such official coercion "interferes with the exercise of the Fifth Amendment privilege against self-incrimination." State v. Graves, 60 N.J. 441, 450, 291 A.2d 2 (1972). The municipal court did not formally rule on the defense's objection and did not reference Sergeant Pilot's testimony in its factual findings. The Garrity issue is not before us.

[6] Although the court made no mention of the complaint relating to the January 9 incident, the municipal court disposition sheet indicates that complaint was "merged" into the two other charges.

flyers in the garage and locker room, that the bubble dialogue inscribed on the Haltons' wedding photograph was "lewd and obnoxious," and that such language would "seriously annoy any person, in this case Mr. Halton." The court imposed fines of $500 for each conviction and additional financial assessments and costs.

## B.

In a de novo trial on the record before the Law Division, the court found Burkert guilty beyond a reasonable doubt of committing acts of harassment on January 8 and 11. The court determined that Burkert created and circulated the photographs and did so with the purpose to harass, and further that the harassing conduct was not protected by the First Amendment. More specifically, the court held that Burkert's intent in placing the vulgar language on the photos was to seriously annoy Halton in violation of N.J.S.A. 2C:33–4(c). The Law Division imposed the same fines, assessments, and costs as the municipal court.

## C.

A panel of the Appellate Division reversed Burkert's conviction, concluding that "the commentary [Burkert] added to [Halton's] wedding photograph was constitutionally protected speech." State v. Burkert, 444 N.J. Super. 591, 594, 135 A.3d 150 (App. Div. 2016).[7] The panel accepted the argument that "the altered photograph . . . was not directed to [Halton]," but rather to an audience of possibly willing listeners—other corrections officers. Id. at 601–02, 135 A.3d 150. The panel determined that the evidence did not support a finding that the flyers "were a direct attempt to alarm or seriously annoy" Halton or to invade his privacy rights. Id. at 601, 135 A.3d 150. The panel stated that the "uncouth annotations to [Halton's] wedding photograph" amounted to "constitutionally

---

[7] The Appellate Division did not consider the Garrity question because of its finding that Burkert's "conduct was non-actionable protected speech." Id. at 599, 135 A.3d 150.

protected expression, despite its boorish content, which bothered or embarrassed [Halton]." Ibid. The panel also found that the vulgar commentary on the flyers, although "unprofessional, puerile, and inappropriate for the workplace," did not constitute criminal harassment. Id. at 603, 135 A.3d 150. The panel did not address whether the flyers exposed Burkert to employment discipline. Ibid.

We granted the State's petition for certification. 227 N.J. 377, 151 A.3d 977 (2016). We also granted the motions of the Pennsylvania Center for the First Amendment and the American Civil Liberties Union of New Jersey (ACLU–NJ) to participate as amicus curiae.

## II.

### A.

The State argues that the Appellate Division erred in vacating Burkert's harassment conviction on First Amendment grounds and that Burkert's conduct in creating and distributing the flyers was sufficient to justify the conviction. According to the State, "[t]he harassment statute restricts conduct, not speech," and the right to free speech "does not encompass a right to abuse or annoy another person intentionally." The State contends that "speech or writing used as an integral part of the harassing conduct is not entitled to First Amendment protection." The State rejects the notion that Burkert engaged in permissible speech with an audience that included willing listeners, suggesting that inmates may have been part of that audience and that a "workplace audience is 'captive.'" The State emphasizes that N.J.S.A. 2C:33–4(c) requires that a defendant act with the purpose to harass—"with a conscious object . . . to annoy"—to demonstrate that permissible speech will not fall within the statute's sweep. To establish that Burkert's "course of conduct was alarming and injurious," the State points to Burkert's admission that "he made the flyers as an alternative to physically assaulting Halton" and,

from that admission, reasons that Burkert intended "the flyers to have the same effect as a fight."

## B.

Burkert contends that the Appellate Division properly vacated his conviction, reasoning that "[u]nder the First Amendment, the State cannot prosecute an individual for publicly taunting another, even if done through crude language and with an intent to annoy." Burkert asserts that the speech on the flyers constituted an opinion and cannot be criminalized by labeling it conduct. Burkert asks this Court to "reaffirm" that "the mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected."

## C.

Amicus Pennsylvania Center for the First Amendment submits that the Appellate Division correctly reversed Burkert's conviction for the following reasons: (1) New Jersey jurisprudence has "applied the criminal harassment statute only to repeated communication to an unwilling listener, not speech about an unwilling listener"; (2) the flyers at issue conveyed words and pictures— traditional means of speech—and cannot be reclassified as conduct to evade the protections of the First Amendment; (3) the speech here did not fall into the category of speech integral to a criminal offense because the flyers were not ancillary to other conduct— rather, the expressions on the flyers were the only target of the prosecution; (4) speech does not lose its First Amendment protection, however vulgar the content, even when its purpose is simply to offend; and (5) Burkert's speech was no less deserving of constitutional protection because the matters addressed were personal rather than political.

## D.

Amicus ACLU–NJ proposes that this Court adopt a "sensible construction" of the language "purpose to harass" in N.J.S.A.

2C:33–4(c) that will keep the statute within constitutional bounds. The ACLU–NJ contends that a defendant's use of speech with the intent "to insult, embarrass or even humiliate" should not be sufficient to justify a harassment conviction under N.J.S.A. 2C:33–4(c), even though such conduct may trigger civil consequences, such as a private tort action or employment discipline. The ACLU–NJ suggests that we construe N.J.S.A. 2C:33–4(c) to require that a "defendant have the conscious object to cause in the victim the fear or apprehension of intrusion into the victim's safety, security, or seclusion." According to the ACLU–NJ, that interpretation is consistent with our case law and will make clear that the statute cannot criminalize "insulting and even vulgar communications" of the type in this case that are an inevitable part of the aggravations of daily existence.

### III.

The issue before us is whether Burkert is guilty of harassment because, as he intended, the lewd flyers seriously annoyed Halton. In addressing that issue, we must determine whether the Legislature intended N.J.S.A. 2C:33–4(c) to criminalize the type of speech in this case.

To understand the meaning of N.J.S.A. 2C:33–4(c), we must look not only to the statutory language, but also to related provisions in surrounding statutes. State v. Crawley, 187 N.J. 440, 452, 901 A.2d 924 (2006) ("[W]e do not read [statutory words] in a vacuum, but rather 'in context with related provisions so as to give sense to the legislation as a whole.'" (quoting DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005))). We begin with N.J.S.A. 2C:33–4, which provides:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or in any other manner likely to cause annoyance or alarm;

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

The statute distinguishes between "communications" and "language" that violate the statute in subsection (a), and "conduct" and "acts" that do so in subsection (c). Likewise, in surrounding statutes, the Legislature has clearly indicated when language and communication can be the basis for a criminal prosecution. The "disorderly conduct" statute targets "unreasonably loud and offensively coarse or abusive language" in a public place, N.J.S.A. 2C:33–2(b) (emphasis added), and the "cyber-harassment" statute targets certain online "communication[s]," N.J.S.A. 2C:33–4.1 (emphasis added). The Legislature has made clear when its primary objective is to classify speech as criminal in nature.

Although a "course of alarming conduct" or "repeatedly committed acts" can occur through communications and language alone, it is far from clear that the Legislature had in mind offensive speech as the object of N.J.S.A. 2C:33–4(c). This point comes into better focus by examining the Model Penal Code (MPC) Section 250.4, which is the source of N.J.S.A. 2C:33–4. See N.J.S.A. 2C:33–4; 1 The New Jersey Penal Code: Final Report § 2C:33–4 (Criminal Law Revision Comm'n 1971); State v. Robinson, 217 N.J. 594, 606, 92 A.3d 656 (2014) ("When a provision of the Code is modeled after the MPC, it is appropriate to consider the MPC and any commentary to interpret the intent of the statutory language.").

MPC Section 250.4, which is entitled "Harassment," provides:

A person commits a petty misdemeanor if, with purpose to harass another, he:

(1) makes a telephone call without purpose of legitimate communication; or

(2) insults, taunts or challenges another in a manner likely to provoke violent or disorderly response; or

(3) makes repeated communications anonymously or at extremely inconvenient hours, or in offensively coarse language; or

(4) subjects another to an offensive touching; or

(5) engages in any other course of alarming conduct serving no legitimate purpose of the actor.

Subsections (1) through (3) of MPC Section 250.4 correspond to N.J.S.A. 2C:33–4(a). The MPC Commentaries indicate that "[s]ub-

sections (1) through (3) of [MPC Section 250.4] proscribe harassment by communication." Model Penal Code (MPC) § 250.4 cmt. 6 (Am. Law Inst. 1962). On the other hand, MPC Section 250.4(5), which directly corresponds to N.J.S.A. 2C:33–4(c), primarily prohibits "harassment by action rather than by communication," ibid., and does not apply to harassment covered by the other subsections, id. § 250.4 cmt. 5. The MPC drafters provide three illustrations of conduct proscribed by subsection (5): "burning a cross on the lawn of a black family," "leaving animal carcasses on a neighbor's stoop," and "shining a spotlight into a parked car in order to embarrass or frighten the occupants." Ibid. Those examples suggest that subsection (5) focused on conduct intended to cause fright and threaten a person's safety, security, or reasonable expectation of privacy.

Under subsection (5), the MPC drafters acknowledge a potential scenario "of harassing conduct [that] is so imbued with expressive content as to implicate first-amendment concerns." Id. § 250.4 cmt. 6. Nevertheless, the drafters believed that such concerns "would probably be excluded by the statutory requirements that the action serve no legitimate purpose of the actor and that there be a purpose to harass." Ibid.

Unlike MPC Section 250.4(5), N.J.S.A. 2C:33–4(c) allows for a harassment conviction based on conduct that "seriously annoys" another. As a consequence, N.J.S.A. 2C:33–4(c) criminalizes a much broader swath of conduct than the MPC. Additionally, unlike the MPC, N.J.S.A. 2C:33–4(c) does not limit prosecutions to expressive acts or conduct that have "no legitimate purpose." Overall, compared to our state harassment statute, MPC Section 250.4(5) is more narrowly drawn to insulate it from potential First Amendment concerns.

That the primary thrust of N.J.S.A. 2C:33–4(c) is not to interdict speech, but rather conduct, is reinforced in State v. Hoffman, 149 N.J. 564, 695 A.2d 236 (1997). In that case, we found that a defendant who ripped up a court support order and sent it to his estranged wife did not constitute harassment under N.J.S.A.

2C:33–4(a). Id. at 584, 695 A.2d 236. In rendering that decision, we distinguished subsection (c) from subsection (a) of N.J.S.A. 2C:33–4. We explained that

> [t]he purpose of subsection (c) is to reach conduct not covered by subsections (a) and (b). For example, if a person were to ring a former companion's doorbell at 3:00 p.m. on Sunday, flash bright lights into her windows on Monday at 6:00 p.m., throw tomatoes into her front door on Tuesday at 6:30 p.m., throw eggs on her car on Wednesday, and repeat the same conduct over a two-week period, a judge could find that subsection (c) has been violated. We do not imply by that example that five or more episodes are required to establish a course of alarming conduct. [Id. at 580–81, 695 A.2d 236.]

The example given in Hoffman indicates that the Court considered subsection (c)—which makes unlawful a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy"—as targeting harassment by action. Despite the Hoffman example, we do not doubt that, in certain clearly defined circumstances, speech can take the form of conduct and therefore be the appropriate focus of a subsection (c) prosecution. It is evident, however, that the Legislature was not homing in on speech in subsection (c).

In the cyber-harassment statute, N.J.S.A. 2C:33–4.1, which became effective in 2014, the Legislature made it a crime when a defendant, through an online electronic communication, "threatens to inflict injury or physical harm"; "threatens to commit any crime against [a] person or [a] person's property"; or knowingly sends lewd or obscene material with the "intent to emotionally harm a reasonable person." The cyber-harassment statute limits the criminalization of speech mostly to those communications that threaten to cause physical or emotional harm or damage. The cyber-harassment statute's precise and exacting standard thus stands in contrast to the more loosely worded language of N.J.S.A. 2C:33–4(c).

One further observation. At the time the Legislature passed the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1–1 to 104–9, it repealed New Jersey's last criminal libel statute, N.J.S.A. 2A:120–1. L. 1978, c. 95, § 2C:98–2 (eff. Sept. 1, 1979). In doing so, the Legislature signaled that the criminal law would not be used as a

weapon against defamatory remarks, thereby aligning our new criminal code with the Model Penal Code.

The MPC Commentaries reveal that a criminal libel provision was not included in the MPC because "penal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person in ways that entitle him to maintain a civil suit." Model Penal Code (MPC Tentative Draft) § 250.7 cmt. 2 (Am. Law Inst., Tentative Draft No. 13, 1961). Criminal laws are usually reserved "for harmful behavior which exceptionally disturbs the community's sense of security," not for "personal calumny." State v. Browne, 86 N.J. Super. 217, 228, 206 A.2d 591 (App. Div. 1965) (quoting MPC Tentative Draft § 250.7 cmt. 2).[8]

Accordingly, the Legislature framed the New Jersey Code of Criminal Justice with a conscious deference to the right of free expression. We now turn to the constitutional constraints placed on overly broad criminal statutes that threaten the right to free speech.

IV.

A.

The First Amendment protects "freedom of speech," U.S. Const. amend. I., as does Article I, Paragraph 6 of the New Jersey Constitution, which states that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right."

Laws may "not transgress the boundaries fixed by the Constitution for freedom of expression." Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948). Accordingly, "the scrutiny to be accorded legislation that trenches upon first amend-

---

[8] Defamatory speech that is protected from criminal prosecution may nonetheless be subject to a civil action and damages. New Jersey, like many other states, has made tort remedies available to those who suffer such affronts. See, e.g., Senna v. Florimont, 196 N.J. 469, 958 A.2d 427 (2008).

ment liberties must be especially scrupulous." State v. Cameron, 100 N.J. 586, 592, 498 A.2d 1217 (1985). The constitutional guarantee of free speech, moreover, imposes higher "standards of certainty" on criminal laws than civil laws. Winters, 333 U.S. at 515, 68 S.Ct. 665. "Penal laws ... are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments." Cameron, 100 N.J. at 592, 498 A.2d 1217.

Criminal laws touching on speech must give fair notice of where the line is set between what is permissible and proscribed and must be drawn "with appropriate definiteness." Winters, 333 U.S. at 515, 68 S.Ct. 665 (quoting Pierce v. United States, 314 U.S. 306, 311, 62 S.Ct. 237, 86 L.Ed. 226 (1941)); accord Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Vague and overly broad laws criminalizing speech have the potential to chill permissible speech, causing speakers to silence themselves rather than utter words that may be subject to penal sanctions. Reno v. ACLU, 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Such laws also give government authorities undue prosecutorial discretion, thus increasing "the risk of discriminatory enforcement." See Reno, 521 U.S. at 872, 117 S.Ct. 2329 (citing Denver Area Educ. Telcomms. Consortium v. FCC, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996)).

"A court can invalidate a statute that is substantially overbroad on its face" if "the statute 'reaches a substantial amount of constitutionally protected conduct.'" State v. Mortimer, 135 N.J. 517, 530, 641 A.2d 257 (1994) (quoting Houston v. Hill, 482 U.S. 451, 458–59, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). Such a drastic remedy, however, is not the only—and not even the preferred—approach. State Chamber of Commerce v. Election Law Enf't Comm'n, 82 N.J. 57, 81, 411 A.2d 168 (1980) (holding that "narrow and discriminate construction of the key terms of the legislation serves to overcome its major overbreadth objections" and is done "to salvage the Legislature's own product"). When a

statute's constitutionality is subject to doubt because of ambiguity in its wording, we proceed under "the assumption that the legislature intended to act in a constitutional manner." State v. Johnson, 166 N.J. 523, 540–41, 766 A.2d 1126 (2001) (quoting Right to Choose v. Byrne, 91 N.J. 287, 311, 450 A.2d 925 (1982)). Provided that a statute is "reasonably susceptible" to an interpretation that will render it constitutional, we must construe the statute to conform to the Constitution, thus removing any doubt about its validity. State v. Profaci, 56 N.J. 346, 350, 266 A.2d 579 (1970); see also State Bd. of Higher Educ. v. Bd. of Dirs. of Shelton Coll., 90 N.J. 470, 478, 448 A.2d 988 (1982).

In short, we must construe a statute that criminalizes expressive activity narrowly to avoid any conflict with the constitutional right to free speech. For example, in State v. Rosenfeld, this Court affirmed the overturning of the defendant's conviction under N.J.S.A. 2A:170–29(1) for using foul language (the words "Mother F ing") in a school auditorium during a municipal discussion on racism. 62 N.J. 594, 603–04, 303 A.2d 889 (1973). N.J.S.A. 2A:170–29(1)—a predecessor statute to N.J.S.A. 2C:33–2 and -4—made it an offense for a person to "utter[ ] loud and offensive or profane or indecent language in any . . . place to which the public is invited." The Court noted, "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." Rosenfeld, 62 N.J. at 603, 303 A.2d 889 (quoting Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)). The Court constrained the broadly worded statute so that it only "prohibits indecent language which is spoken loudly in a public place and is of such nature as to be likely to incite the hearer to an immediate breach of the peace." Ibid. (emphasis added).

In rendering its decision, the Rosenfeld Court cited extensively to Gooding v. Wilson, in which the United States Supreme Court vacated the conviction of a defendant who violated a Georgia misdemeanor statute that prohibited the use of "opprobrious words or abusive language, tending to cause a breach of the

peace." Rosenfeld, 62 N.J. at 600, 303 A.2d 889 (quoting Gooding v. Wilson, 405 U.S. 518, 519, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)). The United States Supreme Court found the statute unconstitutionally overbroad because the statute made it a misdemeanor "merely to speak words offensive to some who hear them." Ibid. (quoting Gooding, 405 U.S. at 527, 92 S.Ct. 1103).

Significantly, this Court has construed the language in subsection (a) of N.J.S.A. 2C:33–4—which proscribes communications made in any "manner likely to cause annoyance or alarm"—as encompassing, "for constitutional reasons, only those modes of communicative harassment that 'are also invasive of the recipient's privacy,'" Cesare v. Cesare, 154 N.J. 394, 404, 713 A.2d 390 (1998) (quoting Hoffman, 149 N.J. at 583, 695 A.2d 236), and that constitute threats to safety, see id. at 414–15, 713 A.2d 390. In that vein, our courts have upheld harassment convictions pursuant to N.J.S.A. 2C:33–4(a) where a defendant scrawled racially offensive graffiti on a victim's home, Mortimer, 135 N.J. 517, 641 A.2d 257, made persistent unwanted telephone calls, which included a racial slur, to the victim's workplace, State v. Fin. Am. Corp., 182 N.J. Super. 33, 440 A.2d 28 (App. Div. 1981), and repeatedly knocked on the door and rang the doorbell of a home in which the defendant's physically abused wife had sought shelter, State v. Reyes, 172 N.J. 154, 796 A.2d 879 (2002).

### B.

How courts in other states have addressed harassment statutes is also instructive.

In People v. Norman, the Colorado Supreme Court declared the state's harassment statute unconstitutional due to vagueness. 703 P.2d 1261, 1267 (Colo. 1985). Colo. Rev. Stat. Section 18–9–111(1)(d) (1978) (repealed, H.B. 90–1118, 57th Gen. Assemb., 2d Reg. Sess. (Colo. 1990))—like N.J.S.A. 2C:33–4(c)—provided that a person commits the crime of harassment if, "with intent to harass, annoy, or alarm another person," he "engages in conduct or repeatedly commits acts that alarm or seriously annoy another

person and that serve no legitimate purpose." The Colorado high court found the statute constitutionally infirm on due process grounds because it provided no limiting standards "to assist citizens, courts, judges or police personnel to define what conduct is prohibited and, conversely, what conduct is permitted" and gave prosecutors "unfettered" discretion. Norman, 703 P.2d at 1267.

Norman followed an earlier Colorado Supreme Court decision that struck down a subsection of Colorado's harassment statute similar to N.J.S.A. 2C:33–4(a). Bolles v. People, 189 Colo. 394, 541 P.2d 80, 84 (1975). The court found that the statute was impermissibly overbroad and impinged on free-speech rights. Ibid. The court determined that the terms "annoy" and "alarm" were so vague that even innocuous comments about noteworthy but unpleasant topics might subject a person to criminal prosecution. Id. at 82–83.

Likewise, the United States Court of Appeals for the Fifth Circuit struck down on vagueness grounds a Texas harassment statute similar to N.J.S.A. 2C:33–4(a). Kramer v. Price, 712 F.2d 174, 178 (5th Cir. 1983). The Fifth Circuit found that the absence of clear enforcement guidelines gave prosecutors "unbounded discretion" and subjected the exercise of First Amendment rights to an "unascertainable standard." Ibid.

In People v. Dietze, the New York Court of Appeals declared a subsection of New York's harassment statute, N.Y. Penal Law § 240.25(2) (1988) (current version at N.Y. Penal Law § 240.26), overbroad and therefore unconstitutional because of its potential infringement on free-speech rights. 75 N.Y.2d 47, 550 N.Y.S.2d 595, 549 N.E.2d 1166, 1167 (1989). N.Y. Penal Law Section 240.25(2) stated: "A person is guilty of harassment when, with intent to harass, annoy or alarm another person ... [i]n a public place, he uses abusive or obscene language, or makes an obscene gesture." In overturning subsection (2), the Court of Appeals cautioned that "any proscription of pure speech must be sharply limited to words which, by their utterance alone, inflict injury or

tend naturally to evoke immediate violence or other breach of the peace." Dietze, 550 N.Y.S.2d 595, 549 N.E.2d at 1168.

Those cases reinforce the notion that harassment statutes must be written with sufficient precision to ensure that protected speech does not fall within the realm of a potential criminal prosecution and to give fair notice of where free speech ends and criminal conduct begins.

## V.

## A.

We conclude that the vaguely and broadly worded standard in N.J.S.A. 2C:33-4(c) does not put a reasonable person on sufficient notice of the kinds of speech that the statute proscribes. The statute's vagueness also gives prosecuting authorities undue discretion to bring charges related to permissive expressive activities. That, in turn, means that the statute—if not more narrowly defined—has the capacity to chill permissible speech.

Although patterned after the MPC, N.J.S.A. 2C:33-4(c) is more broadly written than its MPC counterpart and therefore more likely to impinge on protected expressive activities. Whereas N.J.S.A. 2C:33-4(c) permits the conviction of a person who acts with the purpose to "seriously annoy" another person, under the corresponding MPC provision a conviction may be premised only on "alarming conduct." Unlike its MPC counterpart, N.J.S.A. 2C:33-4(c) is not restricted to conduct that serves "no legitimate purpose of the actor." See N.J.S.A. 2C:33-4(c).

The circularity of the language of N.J.S.A. 2C:33-4, moreover, does not place limits on the statute. Under N.J.S.A. 2C:33-4, an accused may not be convicted unless he acts "with the purpose to harass." However, one common definition of harass is to annoy. See Black's Law Dictionary 784 (9th ed. 2009); Webster's Third New International Dictionary 1031 (1981). Accordingly, the words "harass" and "annoy" are interchangeable. By that reckoning, under subsection (c), a person who, with the purpose to seriously

annoy another, does seriously annoy another is guilty of harassment.

■ Speech, however, cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt. See Houston, 482 U.S. at 461, 107 S.Ct. 2502 (stating that speech cannot be punished unless it is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest" (quoting Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949))); cf. Snyder v. Phelps, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). "There is no categorical 'harassment exception' to the First Amendment's free speech clause." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001).

■ The First Amendment protects offensive discourse, hateful ideas, and crude language because freedom of expression needs breathing room and in the long run leads to a more enlightened society. See Terminiello, 337 U.S. at 4, 69 S.Ct. 894. Outside of the category of obscenity, courts should not play the role of censor by engaging in a weighing of an expression's value or "relative social costs and benefits." United States v. Stevens, 559 U.S. 460, 470, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); see also Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 792–93, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). Speech cannot be criminalized merely because others see no value in it. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." R.A.V. v. St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citations omitted).

■ Nonetheless, neither the First Amendment nor Article I, Paragraph 6 of our State Constitution prohibits the State from criminalizing certain limited categories of speech, such as speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct. See United States v. Alvarez, 567 U.S.

709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012); cf. Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264, 716 A.2d 1137 (1998). For example, a robber's command that a victim turn over money is unprotected speech because the expressive activity is integral to the commission of a crime. Likewise, laws that punish threats of physical harm are constitutional because the State has a strong interest in "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." R.A.V., 505 U.S. at 388, 112 S.Ct. 2538; see also United States v. Turner, 720 F.3d 411, 420–21 (2d Cir. 2013) (holding that defendant's threatening statements to judges, despite political content, were not protected by First Amendment).

The First Amendment also does not bar states from enacting laws that punish expressive activity when "substantial privacy interests are being invaded in an essentially intolerable manner." See Cohen, 403 U.S. at 21, 91 S.Ct. 1780. Although the "presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense," the government, for example, may "prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue." Ibid. A speaker using a bullhorn in a town square may voice objectionable ideas to passing members of the public who are seemingly a captive audience without offending the First Amendment, but the Constitution will not protect the speaker with a bullhorn bellowing outside a home in the early morning hours. See Frisby v. Schultz, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (noting that although "[o]ne important aspect of residential privacy is protection of the unwilling listener," " 'we are often "captives" outside the sanctuary of the home and subject to objectionable speech' " (quoting Rowan v. Post Office Dep't, 397 U.S. 728, 738, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970))).

In Hoffman, we determined that the catchall language of N.J.S.A. 2C:33–4(a)—"any other manner likely to cause annoyance

or alarm"—was intended to "encompass only those types of communications that also are invasive of the recipient's privacy," a purpose that would not run amiss of any constitutional proscription. See 149 N.J. at 583–84, 695 A.2d 236. According to another court, the constitutional right to free expression does not protect one who "repeatedly invade[s]" another person's reasonable expectation of privacy "through the use of acts and threats that evidence a pattern of harassment designed to inflict substantial emotional distress." People v. Borrelli, 77 Cal.App.4th 703, 91 Cal.Rptr.2d 851, 859–60 (2000).

Recognizing that the First Amendment and Article I, Paragraph 6 of our State Constitution allow the State to punish threatening speech or speech that invades a person's reasonable expectation of privacy in an intolerable manner informs our analysis in construing the broad language of N.J.S.A. 2C:33–4(c) within constitutional bounds.

## B.

Unlike some of our sister jurisdictions that have struck down overly broad and vague harassment statutes, our approach is to conform subsection (c) of N.J.S.A. 2C:33–4 "to the Constitution in a way that the Legislature would have intended." See State v. Natale, 184 N.J. 458, 485–86, 878 A.2d 724 (2005). In adopting N.J.S.A. 2C:33–4(c), which was patterned after its MPC counterpart, the Legislature's apparent intent was to address harassment by action rather than communication. See MPC § 250.4 cmt. 6. We cannot say that the Legislature intended to criminalize speech that poses no threat to a person's safety or security or speech that does not intolerably interfere with a person's reasonable expectation of privacy. We have come to that conclusion by comparing subsection (c) of N.J.S.A. 2C:33–4 to subsection (a), to N.J.S.A. 2C:33–2, and to the cyber-harassment statute; by our analysis of the MPC Commentaries; and by our review of case law, including the example given in Hoffman of conduct proscribed by subsection (c). We also find the limitations that we have placed on the catch-all

provision of subsection (a) instructive. See Cesare, 154 N.J. at 404, 414–15, 713 A.2d 390; Hoffman, 149 N.J. at 583, 695 A.2d 236.

The constraint we place on the overbroad language of subsection (c) is compelled by the principles animating our free-speech guarantees. We now return to the specific language of the statute at issue.

## C.

N.J.S.A. 2C:33–4 provides:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he:

. . .

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

In cases based on pure expressive activity, the amorphous terms "alarming conduct" and "acts with purpose to alarm or seriously annoy" must be defined in more concrete terms consonant with the dictates of the free-speech clauses of our Federal and State Constitutions. Narrowly reading the terms alarm and annoy—as we have done in past cases involving subsection (a) of N.J.S.A. 2C:33–4—will save the statute from constitutional infirmity. See Cesare, 154 N.J. at 404, 713 A.2d 390 (stating that "provision in N.J.S.A. 2C:33–4(a) prohibiting conduct communicated in any manner likely to cause annoyance or alarm encompasses, for constitutional reasons, only those modes of communicative harassment that 'are also invasive of the recipient's privacy' " (quoting Hoffman, 149 N.J. at 583, 695 A.2d 236)). We believe the Legislature would prefer a subsection (c) prohibiting verbal harassment that conforms to the First Amendment than no such provision at all.

Therefore, for constitutional reasons, we will construe the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" as repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable

expectation of privacy. Of course, the Legislature may decide to amend subsection (c) with other language that conforms to the requirements of our free-speech clauses.

To be clear, the standard set forth above applies only in those cases where the alleged harassing conduct is based on pure expressive activity. Under that standard, repeated threats or menacing communications that reasonably place a person in fear for his safety or security are not protected expressive activities. Likewise, a person who repeatedly makes unwanted communications to a subject, thereby intolerably interfering with his reasonable expectation of privacy, will not find shelter behind the First Amendment. Thus, a person who every day, over the course of a week, either repeatedly yells outside an ex-partner's house during the night, or repeatedly follows closely next to a woman importuning her for a date or making other unwanted comments, despite constant demands to stop, would violate subsection (c).

Subsection (c) was never intended to protect against the common stresses, shocks, and insults of life that come from exposure to crude remarks and offensive expressions, teasing and rumor mongering, and general inappropriate behavior. The aim of subsection (c) is not to enforce a code of civil behavior or proper manners.

The prosecution in this case targeted purely expressive activity and therefore we apply the heightened standard of subsection (c) set forth above.

## VI.

■ We recognize that neither the municipal court nor Law Division judge who sat in this case had the benefit of the standard developed in this opinion. They applied the statute as written. Although in other circumstances a remand might be appropriate, we see no point here because even the most indulgent view of the record favoring the State would not support a harassment conviction under N.J.S.A. 2C:33–4(c).

First, we note that, based on the issuance of separate summonses, Burkert was charged with and convicted of committing acts of harassment on discrete dates, January 8 and 11, 2011. However, a conviction under N.J.S.A. 2C:33-4(c) requires the finding of a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy." Neither the municipal court nor Law Division judge specifically found that Burkert engaged in a course of conduct or repeatedly committed acts.

The record soundly supports the municipal court's finding that Burkert circulated the flyers in the correctional facility's garage on January 8. Although the municipal court found that Burkert distributed the flyers discovered in the locker room on January 11, no testimony was offered that Burkert worked on that date.

The record unquestionably supports the finding of the municipal court—echoed by the Law Division—that the bubble dialogue Burkert scribbled on Halton's wedding photograph was "lewd and obnoxious" and seriously annoyed Halton as it would have any reasonable person. Burkert clearly intended to seriously annoy Halton because he believed that Halton's wife had insulted Burkert and members of his family on an internet website. The issue is not whether Burkert's expressive activity—placing offensive dialogue on Halton's wedding photograph and then circulating the flyers—was boorish, crude, utterly unprofessional, and hurtful. Of that there can be no doubt. Within a workplace setting, such conduct was grossly inappropriate.

However, our task here is to determine whether Burkert violated a criminal statute. Even assuming that the circulation of the flyers constituted a course of conduct or repetitive acts, the State did not present sufficient evidence to support a conviction under N.J.S.A. 2C:33-4(c). The flyers were intended to and did humiliate Halton. The flyers, however, did not threaten or menace him. Nothing in the record suggests that Halton's safety or security were put at risk by the flyers, or that any inmates got ahold of them.

The record, moreover, does not establish that Burkert had repeated unwanted communications with Halton. Burkert's only direct interaction with Halton concerning the flyers occurred on January 8. The rude and loutish dialogue on the flyers obliquely referred to a matter apparently of common knowledge among many corrections officers—that Halton's former wife allegedly had relations with a corrections officer and inmate. Although Burkert displayed appalling insensitivity, he did not engage in repeated unwanted communications with Halton that intolerably interfered with his reasonable expectation of privacy.

The facts in this case—even when viewed in the light most favorable to the State—do not satisfy the elements necessary for a subsection (c) violation of the harassment statute.

Having come to that conclusion does not foreclose other potential remedies or sanctions for the behavior at issue in this case. Indeed, workplace discipline was imposed on Burkert, and Halton filed a civil action.

## VII.

For the reasons stated, we affirm the judgment of the Appellate Division, which dismissed the harassment charges.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed a separate opinion, dissenting in part.

Justice Solomon, concurring in part and dissenting in part.

I agree with the majority's conclusion that N.J.S.A. 2C:33-4(c) (harassment statute) required clarification because subsection (c)'s language is impermissibly vague when viewed through the lens of First Amendment free speech protections. However, even under the majority's clarification of the statutory requirements for subsection (c), I find that defendant Burkert's conduct violates the harassment statute. Thus, I respectfully dissent as to the majori-

ty's conclusion that Burkert escapes prosecution under the Court's clarification of N.J.S.A. 2C:33–4(c)'s statutory requirements.

Preliminarily, as a reviewing court, we cannot "disturb the factual findings ... of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). "However, legal issues are subject to de novo review; the appellate court owes no deference to legal conclusions drawn by the trial court." H.S.P. v. J.K., 223 N.J. 196, 215, 121 A.3d 849 (2015) (citing M.S. v. Millburn Police Dep't, 197 N.J. 236, 246 n.10, 962 A.2d 515 (2008)). Here, Burkert admitted under oath that he created, posted, and personally handed the offensive flyers to Halton. The trial court found that Burkert circulated the flyers in the parking garage of the correctional facility and in the employee locker room. Burkert further admitted under oath that he created and posted these flyers only "as payback for what [Halton] did to [Burkert's] family." As the majority concedes, "Burkert clearly intended to seriously annoy Halton." Ante at 286, 174 A.3d at 1003.

Burkert's conduct conflicts with the majority's enunciated requirements of subsection (c)(1)—"constru[ing] the terms 'any other course of alarming conduct' and 'acts with purpose to alarm or seriously annoy' as any repeated communications directed at a person that reasonably puts that person in fear for his safety or security."

The flyers were copied and posted in the men's locker room and in the employee parking lot of Halton's place of employment, the Union County Jail, where Halton worked as a sergeant. As a sergeant, Halton had frequent contact with inmates and held a position of authority over other correctional officers. Moreover, Burkert knew Halton's position and duties within the jail because they worked together for twenty years. Thus, Burkert knew that Halton's safety could reasonably be threatened by posting the

flyers within the jail where co-workers and inmates could easily see them.

The content of the flyers, see ante at 265, 174 A.3d at 991, was such as to inspire mockery and potential disobedience by inmates. Halton testified that the flyers made him fearful because inmates might have seen or redistributed the flyers. Halton testified that "inmates clean [the locker room] . . . [s]o I was afraid that an inmate got a hold of it . . . part of my anxiety [was] that they got a hold of it and they were showing it to all the inmates in the jail and that my authority was going to be undermined." Halton also testified that he felt the flyers undermined his authority with co-workers as well, which led him to fear that his safety at the jail was in jeopardy. As this Court stated in Cesare v. Cesare, although "courts should not consider the victim's actual fear, courts must still consider a plaintiff's individual circumstances and background in determining whether a reasonable person in that situation would have" felt fearful. 154 N.J. 394, 403, 713 A.2d 390 (1998). Here, it was reasonable to find that Halton feared for his safety considering he worked in a position of authority in a county jail where Burkert distributed the two profane flyers.

I now turn to the majority's contention that the flyers were not "repeated communications." New Jersey jurisprudence has scant instruction on the boundaries of what constitutes "repeated" conduct in the context of harassment. What instruction is available points toward a broad definition of "repeated communications." See N.J.S.A. 2C:12–10(a)(2) (defining "[r]epeatedly" as conduct "on two or more occasions" in the context of stalking); Webster's Second New College Dictionary 939 (2d ed. 2001) (defining "repeat" as "[t]o do or say something again"). Therefore, "repeated" conduct, as generally understood by a person of ordinary intelligence, is conduct done more than once. See State v. Goodwin, 224 N.J. 102, 112, 129 A.3d 316 (2016) (noting that, in construing statutes, courts "ascribe to the statutory words their ordinary meaning and significance" and view those words in context (quoting State v. Crawley, 187 N.J. 440, 452, 901 A.2d 924 (2006))).

Although the majority does not directly cite to State v. Hoffman, 149 N.J. 564, 695 A.2d 236 (1997), to support a narrow construction of "repeatedly," Hoffman must be distinguished to avoid confusion. In Hoffman, this Court did not come to its holding based on the number of mailings (two) the defendant sent to the victim. 149 N.J. at 583, 695 A.2d 236. Rather the Court found the two mailings were insufficient to run afoul of N.J.S.A. 2C:33–4(a) because the mailings "were not sent anonymously, or at an extremely inconvenient hour, or in offensively coarse language"— thus, the mailings did not invade the victim's privacy. Ibid.

However, as noted by the majority, N.J.S.A. 2C:33–4(c) was modeled after Model Penal Code (MPC) Section 250.4(5). See State v. Robinson, 217 N.J. 594, 606, 92 A.3d 656 (2014). The comments to MPC Section 250.4(5) provide three illustrations of conduct that would fall within the subsection and be considered harassment. MPC § 250.4 cmt. 5 (Am. Law Inst. 1980). The illustrations include "burning a cross on the lawn of a black family," "leaving animal carcasses on a neighbor's stoop," and "shining a spotlight into a parked car in order to embarrass or frighten the occupants." Ibid. Using the majority's logic in this case, the MPC illustrations would not be harassment if the perpetrator did not directly interact with the black family regarding the cross burning or if the spotlight shone into the car illuminated conduct that was "common knowledge" to some of the community. The majority's interpretation adds unreasonable and illogical requirements to "repeated communication" under N.J.S.A. 2C:33–4(c).

Burkert's conduct also conflicts with the majority's new requirements for subsection (2)—"repeatedly makes unwanted communications to a subject that intolerably interfere with that person's reasonable expectation of privacy." New Jersey recognizes a limited right to privacy in the workplace. See Stengart v. Loving Care Agency, Inc., 201 N.J. 300, 322, 990 A.2d 650 (2010) (finding plaintiff had reasonable expectation of privacy in "e-mails ... exchanged with her attorney on her personal, password-protected,

web-based e-mail account, accessed on a company laptop"); Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 102, 609 A.2d 11 (1992) (finding employer's safety concerns could override employee's right to privacy in mandating drug testing in workplace); Bresocnik v. Gallegos, 367 N.J. Super. 178, 183, 842 A.2d 276 (App. Div. 2004) (finding "a single hand-delivered letter to a work place does not illegally invade privacy").

New Jersey also recognizes the common law tort of intrusion upon seclusion. Hennessey, 129 N.J. at 94, 609 A.2d 11. Although that tort is not at issue here, its elements are instructive and are as follows: an "intentional[ ] intru[sion], physical[ ] or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts, § 652B (Am. Law Inst. 1977). Because New Jersey case law regarding privacy in the workplace focuses on the limits of illegal searches, intrusion upon seclusion is an illustrative parallel to this case.

I believe that, under New Jersey jurisprudence, it is clear that Halton had a reasonable expectation of privacy in his personal relationship with his wife. Included in that expectation of privacy is the expectation that his personal life would not be brought into his place of employment for all of his co-workers, and possibly inmates, to see, discuss, and ridicule. Furthermore, unlike cases that have balanced an employer or the public's interest against the employee's interest in privacy, the employer in this case does not have a competing interest. The flyers in this case served no overarching purpose or interest other than to harass Halton.

Thus, following subsection (2), Burkert's conduct constitutes the criminal act of harassment. The communications found in the flyers were "unwanted" by Halton. The communications were repeated, as previously discussed. And the communications "intolerably interfere[d] with [Halton's] reasonable expectation of privacy."

It is clear to me that Burkert's conduct falls squarely within the prohibited conduct of N.J.S.A. 2C:33–4(c) as interpreted by the majority. Therefore, I respectfully dissent.