# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5415-18T2

C.M.M.,

    Plaintiff-Respondent,

v.

V.E.O.,

    Defendant-Appellant.

_____

Argued November 20, 2020 – Decided December 18, 2020

Before Judges Hoffman and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-1478-19.

Mark A. Fury argued the cause for appellant.

Victoria L. Chase argued the cause for respondent (Rutgers Domestic Violence Clinic, Rutgers Law, attorneys; Victoria L. Chase, of counsel and on the brief; Bryce K. Hurst, on the brief).

PER CURIAM

Defendant V.E.O. appeals from a final restraining order (FRO) entered on May 15, 2019, under the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35. Defendant contends the court erred by finding he committed the predicate offense of harassment and that the FRO was necessary to protect plaintiff C.M.M. from future domestic violence. We reverse the FRO, reinstate the temporary restraining order (TRO) and remand the case for further findings.

I.

Plaintiff filed a complaint against defendant under the Act on March 11, 2019, requesting restraints for the predicate acts of criminal sexual contact, stalking and harassment.[1] A final restraining order hearing was conducted on May 15, 2019. We relate relevant evidence from the hearing.

Plaintiff met defendant in late November 2018 through her cousin and they dated for a few months. She stayed overnight at his place "[a] handful of times," but, she testified, she kept her clothes on because his granddaughter lived there. Their physical relationship was limited to oral sex by defendant. Defendant asked her for pictures of herself without clothes, but she declined.

---

[1] The parties did not include a copy of the complaint or TRO in the appendix.

On February 2, 2019, they went out to dinner with family members and afterwards went to plaintiff's cousin's house for a nightcap. They eventually left and went to defendant's house, where they had another drink. Plaintiff was tired and went to bed. When she awoke the next morning, she was "very tired and groggy." She rolled over defendant's phone and in placing it on the nightstand, "pictures of [her] genitalia popped up onto the screen." There were about twenty or thirty photographs, some of which included her face. She deleted as many as she could and left defendant's place shortly after that. She testified she was "in shock," "felt violated" and apprehensive about what else had occurred.

Defendant called her later that day to ask if she had deleted his pictures. She told him he was not entitled to them, was "sneaky" and needed to delete the remaining pictures.

The next day, defendant texted her and she responded. She described this as "kind of regular conversation." He texted her again on February 5, 2019, asking about his wallet, but after she responded, he said he had found it. Plaintiff testified that defendant continued to call and text her, but she "kind of" ignored him.

Plaintiff texted defendant on February 10, 2019, telling him she was "pissed" and they "need[ed] to address a few things for [his] understanding."

3

She sent him a text message on February 11, 2019, advising him she did not want to speak with him, she had sent him an email and he needed to read it. In the email, she told him she felt violated by the pictures. She expressed that her email was not a "means to open communication and that [she] had nothing more to say after." She testified she wanted no more contact with him after that. The email ended with "I just want you to go away."

Defendant texted her that evening, opening with the statement that he knew she did not want a response. She responded back. He texted twice more that evening, into the early morning hours, but she did not respond and blocked his texts.

Defendant then called twice and left two lengthy voicemails. The first was 12:40 a.m. He mentioned that he would "like to start coming to a final resolution where the pictures get deleted." The voicemail ended with "I'll talk to you later." Defendant called back about 12:50 a.m. and left a second voicemail saying he really wanted to talk with her. He texted again on February 18, 2019, at 10:48 p.m., asking to meet her at a restaurant to discuss things. Defendant left a voicemail message on February 26, 2019. That message said he cared about her and wanted to know how to compensate her for a cup of hers

4

that he still was using and a sweater of hers that he had. He wanted to talk. She did not respond.

During the week of March 3, 2019, defendant went to plaintiff's house to drop off a greeting card with a $50 gift card inside. The note indicated the gift was compensation for her cup and sweater. Defendant put the card in her mail slot. Plaintiff was alarmed when he dropped off the card. She testified if she did not want his calls, "you surely don't come to my home." Plaintiff saw the visit to her house as a "pretense to continue to contact [her]." She testified that she thought he was "unpredictable," and she no longer had peace of mind.

On cross-examination, plaintiff acknowledged defendant did not threaten her physically. He did not make any threats in his communications with her. He did not threaten to show the pictures to anyone. She testified the pictures caused her to feel "fearful, afraid, apprehensive . . . [and] unsafe." She said she was offended, angry and unsure of his actions.

Defendant is a retired special investigator for Pennsylvania and a retired combat service captain in the Army. He acknowledged he had oral sex with plaintiff about six to eight times. He testified there were less than eleven to twelve pictures and they were taken with plaintiff's permission. Defendant stated that plaintiff deleted the photos because they showed her face. He deleted

the last two. He denied plaintiff was upset with him because she stayed at his house until 4:50 a.m. the next day. Defendant denied that plaintiff told him to leave her alone. He testified she invited him to her house "on many occasions" and that he even wanted to marry her.

Defendant said he bought the card for plaintiff to give her "closure." He acknowledged receiving the February 11, 2019 email, but only "scanned" over it because that was about the "time [his] Ambien kicked in." He admitted to sending the text messages and voicemails and that he went to her house with the card because he thought she was upset and wanted to calm her down.

Defendant responded to the February 11 email the next day even though he knew she did not want a response. He sent her another text on February 18. He then went to her house with the gift after that. He testified on re-direct that he did not see in the email where she said not to call her again.

The trial court found plaintiff's testimony to be credible, but not defendant's. She had made clear to defendant on February 11, 2019, that she did not want further contact with him. Nonetheless, he responded to her by texts and voicemails, continuing to contact her through the end of February. Defendant went to her house during the week of March 3, 2019, to drop off a card.

The court found a "purpose to harass" under the Act by defendant's act of leaving the card. The court found the late hours of the texts and voicemails were intended to annoy plaintiff. The court concluded that plaintiff established harassment under both subsection (a) and (c) of N.J.S.A. 2C:33-4. The court found it was "self-evident" that the restraining order was needed to protect plaintiff from further abuse. This was based on the combined number of incidents. The court dismissed the predicate acts for criminal sexual contact and for stalking, finding the elements of those offenses were not established. An FRO was entered on May 15, 2019.

On appeal, defendant claims the trial court erred by finding an intent to harass.

## II.

We accord "great deference to discretionary decisions of Family Part judges[,]" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012), in recognition of the "family courts' special jurisdiction and expertise in family matters . . . ." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "[F]indings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc.

v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Accordingly, "an appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (alteration in original) (quoting Rova Farms Resort, Inc., 65 N.J. at 484). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

When determining whether to grant an FRO under the Act, the trial court must engage in a two-step analysis. Silver v. Silver, 387 N.J. Super. 112, 125-26 (App. Div. 2006). The trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in [N.J.S.A. 2C:25-19(a)] has occurred." Ibid. This determination is made "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Second, the court also must determine whether a restraining order is required to protect the party seeking

restraints from future acts or threats of violence.  Id. at 126-27.  That means "there [must] be a finding that 'relief is necessary to prevent further abuse.'"  J.D. v. M.D.F., 207 N.J. 458, 476 (2011) (quoting N.J.S.A. 2C:25-29(b)).

A person commits the offense of harassment if,

> with purpose to harass another, he (a) [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm . . . or (c)[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a), (c).]

In evaluating a defendant's intent, a judge is entitled to use "[c]ommon sense and experience."  State v. Hoffman, 149 N.J. 564, 577 (1997).  Because direct proof of intent is often absent, "purpose may and often must be inferred from what is said and done and the surrounding circumstances," and "[p]rior conduct and statements may be relevant to and support an inference of purpose." State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006); see also H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) ("[A] purpose to harass may be inferred from . . . common sense and experience." (quoting Hoffman, 49 N.J. at 577)).

A-5415-18

Here, the FRO was entered based on the court's finding that the predicate act of harassment was proven under subsections (a) and (c). N.J.S.A. 2C:33-4(a), (c). There was substantial evidence in the record to support these findings.

A violation of N.J.S.A. 2C:33-4(a) occurs when an individual "[m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively course language, or any other manner likely to cause annoyance or alarm." Our Supreme Court has stated that the following elements are required for such a violation:

> (1) defendant made or caused to be made a communication;
>
> (2) defendant's purpose in making or causing the communication to be made was to harass another person; and
>
> (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.
>
> [C.M.F. v. R.G.F., 418 N.J. Super. 396, 402 (App. Div. 2011) (quoting Hoffman, 149 N.J. at 576).]

"For purposes of [N.J.S.A. 2C:33-4(a)], there need only be proof of a single such communication, as long as defendant's purpose in making it . . . was to harass and as long as it was made in a manner likely to cause annoyance or alarm to the intended recipient." J.D., 207 N.J. at 477. Under the subsection,

10

"annoyance means to disturb, irritate, or bother." <u>C.M.F.</u>, 418 N.J. Super. at 403 (emphasis omitted) (quoting <u>Hoffman</u>, 149 N.J. at 580).

A violation of N.J.S.A. 2C:33-4(c) (subsection c), by contrast, requires proof of a course of conduct. <u>J.D.</u>, 207 N.J. at 478. That may consist of conduct that is alarming, or it may be a series of repeated acts if done with the purpose "to alarm or seriously annoy" the intended victim. <u>Ibid.</u>

It was clear by February 11, 2019, plaintiff did not want further contact with defendant and he knew it. His responding email opened with knowledge that he knew she did not want a response to her email. Defendant continued to contact her from then until she filed the complaint under the Act. These contacts were not solely to try to rekindle the relationship. He gave plaintiff no assurance that the pictures of her genitalia — some of which included her face — were deleted or going to be deleted. His voicemail message to her was that he would "like to start coming to a final resolution where the pictures get deleted," not that they were deleted or were going to be. This communicated that further contact with him would be necessary for him to "start" the discussion about deleting the pictures. He also kept possession of items that belonged to her and reminded plaintiff about them by dropping off a greeting card — through the mail slot in her door — saying he wanted to pay her for the cup and sweater. As

the judge noted, defendant simply could have dropped off these items. He also could have mailed the card. Plaintiff understood this conduct was a "pretense to continue to contact her," not an actual offer of compensation.

Defendant testified his actions were to allow plaintiff to have "closure," but it was the opposite. It communicated that defendant intended to keep items that were hers, which kept the door open. These facts supported the court's finding that defendant's purpose was to harass plaintiff by going to her house with the card and gift. The continued contact and communication was to annoy or alarm plaintiff, satisfying subsection (a), and constituted a course of annoying or alarming conduct that interfered with her reasonable expectation of privacy.

Defendant argues that plaintiff did not satisfy the standards in State v. Burkert, 231 N.J. 257 (2017), requiring dismissal of the complaint. In Burkert, the defendant copied a co-worker's wedding picture from a social media site and defaced it with bubble comments expressed in pornographic terms. Id. at 262-3. This was done in retaliation for comments made online by that co-worker's wife that defendant felt were insulting to his family. Id. at 262. Copies of the defaced picture were placed in the employee parking garage and locker room at the workplace where the co-worker and others found them. Id. at 263.

12

The Court held that N.J.S.A. 2C:33-4(c) was "vaguely and broadly worded" and "does not put a reasonable person on sufficient notice of the kinds of speech that the statute proscribes." Id. at 280. Because this had the "capacity to chill permissible speech," the Court held for "constitutional reasons" that

> we will construe the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" as repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy.
>
> [Id. at 284.]

Burkert made clear that the standard "applies only in those cases where the alleged harassing conduct is based on pure expressive activity." Id. at 285. This case involves both expression and conduct. Burkert also made clear that even in a pure expression case, "a person who repeatedly makes unwanted communications to a subject, thereby intolerably interfering with his reasonable expectation of privacy, will not find shelter behind the First Amendment." Ibid. An example given by the Court is a person who "every day, over the course of a week, . . . repeatedly follows closely next to a woman importuning her for a date or making other unwanted comments, despite constant demands to stop . . . ." This would violate subsection (c). Ibid.

Although not exactly this case, we cannot say that the trial court erred by finding a course of alarming or annoying conduct on this record. Plaintiff wanted no further communication from defendant who already had taken sexually explicit pictures of plaintiff. Defendant communicated that further contact was needed to "start" coming to a resolution to delete the pictures. He kept plaintiff's personal property. All of this conduct interfered with plaintiff's reasonable expectation of privacy.

We are constrained, however, to reverse the FRO based on the second part of Silver that requires the court to determine whether a restraining order is required to protect the party seeking restraints from future acts or threats of violence. The trial court found the need for protection was "self-evident." We do not find that bald assertion to satisfy the findings required by Silver. Because the judge did not make the necessary findings under the second step of the process, as described in Silver, we vacate the FRO, reinstate the TRO, and remand this case to the trial judge to make further findings. See J.D., 207 N.J. at 488. The court may reopen the record to evaluate the ongoing need for an FRO. Based on those findings, the judge should then decide whether to reinstate the FRO.

Vacated and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5415-18