# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1791-22

T.L.,[1]

    Plaintiff-Respondent,

v.

J.D.G.,

    Defendant-Appellant.

_____

Argued January 31, 2024 – Decided February 26, 2024

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-2074-23.

David Thornton Garnes argued the cause for appellant (David T. Garnes, LLC, attorneys; David Thornton Garnes, on the briefs).

Daniel K. Newman argued the cause for respondent.

---

[1] We use initials to refer to the parties to protect plaintiff's privacy and because the names of victims of domestic violence are excluded from public access under Rule 1:38-3(d)(10).

PER CURIAM

Defendant J.D.G. appeals from a final restraining order entered against him pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, based on the predicate act of harassment. Because the judge failed to find defendant acted with a purpose to harass, and no purpose could be reasonably inferred from the facts in the record, and deprived defendant of due process protections by predicating his findings on an incident not alleged in the complaint, we reverse the final restraining order and dismiss plaintiff T.L.'s complaint.

We draw the facts from T.L.'s domestic violence complaint and the one-hour-and-fifteen-minute FRO hearing. The parties are the parents of two children, a girl thirteen at the time of these events and a boy aged seven. The parties have never lived together.

On January 8, 2023, plaintiff filed a domestic violence complaint against defendant alleging:

> she has an ongoing child custody dispute with the
> def[endant] ever since she placed him on child
> support, he's been upset because he is on child support
> so he has been texting her during the early morning
> hours and driving by her place of employment and
> residence at all hours of the day. He has not made any
> threats to harm her but is taking pictures and video
> when he drives by her residence and place of

A-1791-22

employment. Pla[intiff] fears for her safety as his actions seem to be escalating.

The only offense checked off on the form complaint was harassment. Defendant has no criminal history, and the parties have no history of any type of domestic violence, reported or unreported.

At the FRO hearing on February 1, plaintiff testified she filed a motion for child support on December 9, 2022. Defendant testified he filed a cross-motion seeking an order formalizing their shared custody arrangement on January 2, 2023.

According to plaintiff, defendant, on January 7, 2023, texted her their parenting time order from 2013, saying he was coming over to pick up the kids for parenting time. Defendant arrived around 1:00 p.m. and started "yelling for the kids" and saying she was a "worthless scumbag" and an "indecent person." Plaintiff took her children and her mother inside the house and asked defendant to leave her property. She testified he stayed for "four to five minutes" and took "pictures and video" of her house from his car as he was driving away.

The following day, January 8, defendant drove by her job, again taking pictures and video. Plaintiff testified she was a home health care nurse and worked an overnight shift at a private residence. Defendant knew where she

3

worked because he would occasionally pick up the kids there. He didn't text or call or say anything to her, he just drove by slowly for "two to three minutes" early in the morning. Plaintiff flagged down a police officer as she left work to report defendant's behavior. The officer advised her she could go to the police department in her town to request a restraining order, which she did on her way home at 5:00 a.m.

Plaintiff testified defendant had also been texting her at work "at like 4:00 a.m. to 5:00 a.m. in the morning." According to plaintiff, "a lot of the text messages" asserted she was "worthless" and "an indecent person," and "after awhile he sent so many text messages [she] just stopped reading them." Plaintiff claimed the messages started after she filed her application for child support.

In response to the court's question about "other problems in the past," plaintiff replied "[w]ith the name calling, with him popping up [at] . . . my work and my home, no." Plaintiff explained, however, that her sister had been murdered by her boyfriend "in a domestic violence situation" in 2015, "[s]o, when [defendant's] behavior is like escalating, I didn't take it lightly."

Defendant testified he and plaintiff had a parenting time agreement from 2013 and a prior child support order but were not operating under either. He

4

explained they'd dismissed the child support order by mutual agreement when plaintiff decided to go back to school in 2016, and the kids were with him five to six days a week. According to defendant, after plaintiff completed her schooling in 2019, he still had the kids three or sometimes four nights a week. Plaintiff confirmed defendant had been caring for the kids from Friday afternoon through Monday morning every week.

Defendant claimed the problems between the parties did not start when plaintiff filed an application for child support. Defendant testified he was "okay with the child support," and that she "has every right to, you know, ask for child support." Defendant claimed the problem started when plaintiff wouldn't let him see the children and didn't respond to his texts. According to defendant, he'd had the kids as usual from Friday, December 16th through Monday morning on the 19th, and then plaintiff abruptly cut off his parenting time over the holidays without any explanation.

It was defendant who testified he'd sent forty-nine messages about the children from December 25 through January 10, not one of which he claimed was disparaging. He read his texts to plaintiff from Christmas Day. At 2:34 p.m. he texted, "So, what are the kids doing? When are they gonna be ready for presents over here at my parents? They're invited to dinner at my parents'

5

house, roast beef and mashed potatoes." Defendant testified that when he got no response to his text, he later sent another one, asking "Is everything okay? Hello, it's Christmas. Me and my family want to celebrate with the kids. Let me know what's going on." Again, no response.

The court asked defendant why, if plaintiff wasn't responding to his texts and he didn't want to call her on the telephone, he didn't go to court on December 26 to seek relief. Defendant responded that he was "confused" and "didn't know what was happening." He claimed he "wasn't expecting" plaintiff to cut off his access to the children, and it happened "like all of a sudden" with no explanation. Defendant testified plaintiff "works Friday, Saturday, and Sunday night. My kids are with me. I'm consistently in their lives. I'm involved in school activities. It happened so abruptly."

The court responded by saying "See, here's the issue. If you don't get your parenting time, you don't go to the plaintiff's house and scream and holler." Defendant protested that he didn't "scream and holler." The court responded "Didn't do it. How about did you send any of those forty-nine text messages?" Defendant responded that he'd sent all of them. The court next asked "And any of them make any disturb — any inappropriate remarks?" Defendant said no, they were all on his phone and all pertained to the children.

6

The court ordered defendant to "pass them up, all forty-nine." When plaintiff confirmed that the messages were likewise on her phone, the court said "he says he's got forty-nine. Is there more?" Plaintiff replied that she didn't count them and repeated her earlier testimony that "[a]fter awhile I just liked stopped reading like the message." After reviewing both parties' phones, the court said it "didn't see anything in these text messages and [it] didn't read every word of every text message, but there didn't seem [to be] any disparaging remarks."

Plaintiff subsequently located a text defendant sent on January 8, defendant's birthday, and the day she received her TRO, although defendant wasn't served with the order until January 19. The court read the January 8 text into the record.

> So I want to see my kids and spend my birthday with them. You would prefer me to call the cops with the court order as opposed to you being a decent moral person.
>
> How are the kids doing? So how are the children doing since you want to keep or keep them from me. What are you gonna do? Your mom to keep them away from me. Is she even aware that that's what you're doing? So how is this best for our kids? I don't think this is gonna bolster your case in any way. You're very sick, demented individual.

A-1791-22

After reading the text into the record, the judge asked plaintiff if she could "pinpoint what — where is there a disparaging remark you made reference to?" Plaintiff directed the judge to January 15 as he scrolled through the texts on her phone. Apparently reviewing a text or texts from that date, the judge said: "Okay. Let's see. We have comments about low life, comments of your sour, miserable, shitty attitude. You're a worthless human being." After confirming with defendant that he sent those texts, the court gave plaintiff back her phone, stating "I'm returning the text messages to you since they were inadequate."

When the court questioned defendant about his driving by plaintiff's house and work, defendant explained he took one-minute videos of her home and place of work to support his opposition to plaintiff's motion for support and the cross-motion he'd filed for shared residential custody on January 2, 2023. Defendant explained plaintiff had moved to a new home on December 1, 2022, and "wasn't coming forth" with her home address or where she was working, and he wanted video "to document it for court documentation purposes." When the judge asked why he needed the information if he already knew where plaintiff lived and worked, defendant explained "I know where, but that's just me saying it. Me verifying the

document via video" would be "proof so it's just not my word or my testimony."

When the judge asked "well did you present that proof today," defendant answered that he had the "fifty-nine second video on his phone" if the court wished to see it. When the court asked "why is that relevant to this case," defendant quickly answered, "Oh, it's not." He proceeded to explain that plaintiff alleged in her complaint that he was driving by her home and work at all hours, which wasn't true. But if it were true, plaintiff should be able to prove it with pictures and video of him at "all hours of the day, 8:00 o'clock in the morning, 10:00 o'clock in the morning, 1:00 o'clock in the afternoon. Here he is again." Defendant claimed plaintiff didn't have that proof because he only drove by twice "to document where she works and to document her correct address." Defendant claimed he didn't go "back and forth," didn't do it "multiple times" and "didn't have any negative intentions" in doing it, and thus it "doesn't consist (sic) with harassment." That led to the following exchange:

> The court: But, sir, you knew where she worked.
> That's all that's necessary to prove that you knew it.
> You picked the children up there. Is that correct?
>
> Defendant: Yes.
>
> The court: So you didn't have to go by, did you?

Defendant:  I thought I did, so if I did it was under a mistake by me.

The court:  And you have a lawyer?

Defendant:  I — well, for the upcoming [support and custody] case.

After plaintiff confirmed in response to the court's questions that defendant regularly had the children Friday, Saturday, and Sunday nights through December 19, she testified about "an incident" that had occurred the prior July when their daughter had reported waking up at defendant's house with her "bra strap . . . unfastened."  Plaintiff testified the parties agreed at that time that defendant would install motion sensor cameras in the children's rooms, which plaintiff could monitor when she was at work.  Their daughter was comfortable with that arrangement.  Plaintiff testified that after she filed for child support, however, defendant told her "the cameras weren't going back in his house . . . so then I didn't allow my kids to go back over there" because she needed to ensure "my children were safe."

When the judge asked whether her "daughter felt that someone did something inappropriate to her," plaintiff responded "That's what she told me. She didn't — she just said — and the only thing she said was it was a couple of nights she woke up and her bra strap was unfastened."

Plaintiff testified she wanted supervised visitation at that point, but defendant "didn't have anybody to supervise." According to plaintiff, she and defendant sat down with their daughter, and plaintiff thought defendant "suggested the cameras or something or I forget how, but I know he purchased the . . . first cameras we had" and their daughter "felt comfortable with that going over there." Plaintiff claimed they had the camera for a few weeks but then one day when she'd dropped the kids off, her daughter called, and "said the cord was cut or something," and plaintiff "turned around" and "went back and I picked my kids up." Plaintiff explained the parties "never bought a new camera," she just took her Ring camera "and sent it with my kids when they go to his house."

Plaintiff testified that arrangement continued until "[h]e said the cameras are not going back in the house, I'm not sure if it was like retaliation because of the [support motion], so I didn't let my kids stay over his house after that day until I can assure that my kids are safe." Plaintiff did not testify to the date of that conversation, other than to say it happened in January 2023.

According to plaintiff, "it was sometime in January he wanted to take the kids." They agreed to meet at a park. Plaintiff testified defendant played with the children "then he thought that he was taking the kids. I said, well, you

can't take the kids because I didn't — I don't have the camera with me. I need to get my camera from the house and send it with the kids." Plaintiff testified defendant "said he's no longer using the camera, so then I didn't allow my kids to go back."

Although plaintiff did not identify the date of that conversation, she testified defendant only saw the children at the park on one occasion after December 19, and that he last saw the children on January 13 at the park. In response to the court's question, plaintiff testified that there were no texts exchanged about the camera because they'd had the conversation in person at the park.[2]

In response to the court's questions, defendant testified plaintiff had told him about what their daughter had reported the prior July, and that the camera had been his idea. According to defendant, they had a "family discussion about it," and he first "suggested that we go talk to the detectives and we go down to the police station and they do a proper investigation and they take statements from me, [plaintiff], and my daughter. . . . And the end solution was the camera." Defendant claimed he asked their daughter "are you okay?

---

[2] Defendant was not served with the temporary restraining order until January 19, 2023.

Do you need to talk to anybody? If you want to talk to the police . . . or you want to talk to [a] detective, that's fine." He claimed both plaintiff and their daughter were comfortable "with the camera moving forward."

In response to the court's question "What happened to the camera?" defendant testified that "[i]t just stopped working." He claimed "[l]ike [plaintiff] said, my daughter went to go plug it in and it wasn't working." The judge stated "[t]hey don't just stop working," and that plaintiff testified their daughter had told her "the wires were cut." Defendant testified the wire "wasn't cut," and that "I have [the camera] at my house." The court then asked whether defendant had anything further to say because it was "about ready to grant this final restraining order because of this issue over the camera." Defendant protested, saying if plaintiff "believed those allegations to be true" she would have gone to "Child Protective Services and filed a complaint" last July and that he "never stated the camera was not allowed in [his] house."

Defendant's statement led to the court explaining to defendant "See, here's — there's two solutions. One, she calls DYFS [the Division of Youth and Family Services][3] and [it] conducts an investigation. Or two, she doesn't

---

[3] In June 2012, the Department of Children and Families was reorganized and the Division was renamed the Division of Child Protection and Permanency. L. 2012, c. 16.

give you parenting time." That led to another exchange in which the court asked defendant if plaintiff was not complying with their custody order "why not go back to court as opposed to forty-nine text messages?" Defendant responded by trying to explain that was why he "filed [his] counter motion for further custody" on January 2 "with [his] lawyer."

That led to the following exchange:

The court: Sir, I heard discussion that you refused to allow the Ring camera.

Defendant: That is not true. That is absolutely false. I never that — it was my idea. I want the Ring camera. I want the camera in the house.

The court: You never at any time denied the use of the camera through your children's —

Defendant: I never denied it. No. I wanted — I insist on it.

The court: Okay. So, I have to either believe you or the other side as to this issue over the Ring camera.

Defendant: Uh-hum.

The court: And do — have you been paying child support over the last nine years?

Defendant: No, I've been physically supporting my kids in the physical presence. There's many weeks like I said starting 2016 the kids were with me Monday through Saturday. She was at school.

14

. . . .

I mean, I'm supporting them and I'm giving shelter to them. I'm feeding them. I'm clothing them. I'm doing school activities. My son was in diapers and bottles. I mean, she — I supported her going to school. That's fine, that's what she wanted to do, but I was the main physical presence.

The court: When did she stop going to school?

Defendant: September 2019.

The court: Okay. So for the last 2019, '20, '21, '22, three and a half years, you haven't sent to mother one penny of child support?

Defendant: No, we were demonstrating split physical custody. The kids were with me like three to four nights a week.

The court: That doesn't — this [2013] court order says that mom is the parent of primary residence. That's not shared custody.

Defendant: Correct. Well —

The court: So she files for —

Defendant: That's according to the court order, but we weren't — we weren't doing that. We weren't following that court order as far as the parenting time goes. The kids were with me plenty of nights. We were splitting it — doing split physical custody. Sometimes the kids were with me three or four nights a week. Other weeks they would go back with her. There wasn't any kind of —

15

The court:  Whatever the situation is, mom files for
child support and you stop the use of the Ring camera.
Were you aware your daughter was concerned about
her safety?

Defendant: No, she never brought that to my attention.
No.  This was not discussed and I never said that this
camera was not allowed to be in the house.

Defendant again testified "the only thing . . . driving [him]" was to see his kids.  He claimed if plaintiff had ever told him "the reason why you can't see the kids" was because of the camera, "then I would have said, okay, we'll get the camera back.  She never indicated [that] to me.  She just never responded."  Defendant testified he didn't "get to see them on Christmas.  I missed them at my mom's surprise birthday party.  Missed them on New Year's Eve.  She went and filed a restraining order on my birthday, like it's out [of] spite."

When the court asked defendant if he had anything further, defendant noted plaintiff hadn't provided testimony explaining how his actions had "put her life, health and well-being in danger" as stated in the TRO and that he couldn't "see how this falls under" the definition of harassment.  The court allowed him to put the question to plaintiff, who replied:

I believe I'm in danger because . . . he knows where I
live.  I wasn't sure why he's driving by my house, why
he's taking videos, why he's taking pictures of my

16

house, of my home. I don't understand why he's coming to my job. And that he's coming to my property yelling and screaming and yelling and stuff. So I don't — I didn't know his intentions and . . . a couple days before that, I met . . . [defendant]. He texted me. He asked to . . . see the kids at school and I agreed. When my son got out of school we went to the school and so he can just call me or text me at that time to say he want to see the kids and I would meet with him to see the kids. The next day his behavior it was just like erratic and he's yelling and he's screaming and he's waving his court orders and he's saying that he's coming . . . to the house to take the kids without the cameras in the home.[4] So I felt that my kids — my children were in danger.

When defendant asked plaintiff why she felt, as she alleged in her complaint, that the matter was "escalating," plaintiff replied:

At the time I feel it's escalating because days before that [defendant] was able to text my phone and say he wants to see the kids, he wants to meet — and meet somewhere and I would meet with him. It wasn't a problem. The next day, now he's coming to my house, he's screaming. He's yelling, he's running to the door. I had to like — I had to go to the police station and inform them of the situation and then I had to ask him to get off my property. And I don't take this matter — like I said before, I don't take this matter lightly. My sister — she was unaware of her situation too. Like we didn't think that this person was capable of that.

---

[4] Plaintiff had not previously testified that when defendant came to her house on January 7, he'd demanded to take the children "without the cameras," and it is not mentioned in the domestic violence complaint she filed the following day. She'd also not mentioned having any fears for the children in her complaint.

17

I'm not sure how — where he's going with his behavior, but my sister is not here today because of a domestic violence situation and her boyfriend killed her in her sleep, so I don't — I don't feel safe and I just wanted to be sure. If my sister would have know — known she would have probably took the right precautions too, but I'm just not sure —

When defendant attempted to explain to the court that he'd texted plaintiff a picture of the 2013 court order on January 7, stating "I would like to try to pick up my kids in a civil manner," the court again told defendant "[i]f you feel there's a violation of your parenting time, you should go to court and file an application for enforcement." Defendant responded that he hadn't understood he could do that, stating "oh, I didn't know.[5] We . . . had the upcoming custody hearing coming, so that's all gonna be taken care of" — prompting the court to reply: "Well, if this restraining order is made final, the court will make a decision on custody."

Defendant repeated that all his text messages pertained to the children, testifying "I only want to see my kids. I'm not — there's not any — there's no kind of threat or any kind of offensive matter. There's no humiliation or anything like that that falls under consistency of harassment." Defendant

_____

[5] Defendant also testified he'd researched going to the police to enforce his custody order but "it said that only in extreme — in only extreme circumstances will the cops step in" to enforce a parenting time order.

A-1791-22

explained he was trying to formalize the shared custody arrangement the parties had been following, he had "no violent prior history," and in light of the parties' upcoming custody hearing "for someone to drive up and down the street like the plaintiff is attesting to over here would be the absolute — the absolute worst possible thing for me to do." When the court again repeated "But you never went to court," defendant again explained it was "because we had a pending court date coming pertaining to that."

When defendant confirmed in response to the court's question that he and plaintiff both had attorneys for their support and custody proceeding, the court asked "Why wouldn't you bring attorneys for this matter after [the court's] lengthy explanation of how difficult this proceeding is? You didn't think of coming with an attorney for this?" Defendant replied that it was "a money issue," and that he was "already tied up with the attorneys . . . for the custody and the child support." Defendant testified "when this issue came about I don't know anything about this. I didn't know there was a court order — a court hearing that's gonna be prompted off of this or —." The judge cut him off, stating: "I read a two-page document to you about your rights here and how difficult the proceedings are, how to prove a case, what the sanctions

19

are for a final restraining order. I went through all that and you said you're ready to proceed without an attorney."

After hearing the testimony, the judge entered a final restraining order in favor of plaintiff. He began his opinion by stating that "[b]oth parties admit there was a problem regarding some issue with respect to . . . the 13-year-old daughter staying at her father's home. It is that particular element in this case that seems to be developing into a substantial problem, developing into an act of domestic violence." The court continued:

> The court is aware that one of the six criteria under the Silver[6] Part Two is concern for protection of the children, so I consider this to be something of concern. Now, there is little dispute here that there was a problem here with the child feeling comfortable at her father's house.
>
> The solution was the camera. The solution was — or the problem develops when suddenly the camera is not working. As opposed to [defendant] go[ing] out and buying the new camera so the child becomes comfortable, mother is willing to go one step further and use the Ring camera. It is this Ring camera that satisfies the daughter's comfort and suddenly the dispute arises as to whether dad said or didn't say he would permit the Ring camera to continue to be used.
>
> I find that dad refused to allow the Ring camera to be used. I'm satisfied that dad's testimony on that subject was not credible. I'm satisfied that dad refused

---

6 Silver v. Silver, 387 N.J. Super. 112, 127 (App. Div. 2006).

20

to replace the damaged camera and refused to allow the Ring camera to be used. That creates the problem between the parties. That is the straw, so to speak, that develops into a problem.

The problem in which dad sends at least forty-nine text messages that he is admitting to in the court. The court further saw some text messages that were not shown by the defendant as further proofs that the — some of those text messages were clearly annoying in nature.

So, we have a problem over the children. The problem becomes more shown when mother files for child support. Dad apparently never paid child support, felt that he was — had substantial parenting time and didn't have to pay child support. The dispute is going on for some time. We have the court order that is from 2013 which is of little help to resolve the problem between the parties. The problem needs to be more substantially resolved. The court finds that there is a need for this restraining order because dad is gonna continue to do strange things like come over and try to force his way into parenting time. That's not the way it works. You don't force your way with coming to the house or forty-nine text messages. You — there's a problem, you go to court and work something out. . . .

Okay. So, we have this problem of seeking child support. We have this problem of — that the parenting issue is changed many times over. Dad though is attempting to text his way into appropriate parenting time and that's not the way it works. If there's a problem, you go to court.

Mom on the other hand is concerned about a child who doesn't want to see the father because of the

21

lack of video surveillance that the child seems to be comfortable with. . . .

So, the question is, is this harassment? The court says, yes, it is. Dad admits to forty-nine text messages. Some of which were clearly annoying and the Court finds that they were annoying. The Court finds that the annoyance continues when dad shows up to take videos of the place where plaintiff works and where the plaintiff lives, all of which is totally unnecessary, and I find to be annoying type conduct on his part.

Dad is attempting to force his way into parenting time and certainly not appropriate. Dad is objecting to mom seeking child support. Again, not appropriate. The Defendant's actions here are annoying. They are a 2C:33-4(a) and 4(c) violation. The court finds that the predicate act of harassment has been proven.

I'm also satisfied that there's a need here to protect the — at least the one daughter. The daughter would want some type of supervision and was initially satisfied with the supervision supplied by the video camera. The court finds credible how this all developed from mom's testimony that the child felt extremely uncomfortable having her bra strap unstrapped on two occasions or at least two occasions, that is a substantial problem regarding a need for protection.

And certainly prong two of <u>Silver</u> has been proven because of the continuous contact and the parties don't do what they should be doing is going back to court. Mom does file for child support and, of course, dad responds by not just asking for parenting time, but moves for custody.

People have that right to ask for whatever they want in a court action, but the actions the court finds here to be inappropriate. Parties need to seek relief from a court and not seek to harass each other, but I find that plaintiff is in need of the protection of a final restraining order.

Clearly, this is a credibility issue and the court finds favorable to the plaintiff in that regard. As such, the court will grant the final restraining order and no more [visitation] on dad's part unless it is supervised. Sight and sound by appropriate agreed upon supervisor.

Dad needs to get a psychiatric evaluation to determine whether there is a protection issue for the children, especially the thirteen-year-old daughter who has concerns.

DYFS should be involved because there is a DYFS issue and the child needs to be interviewed not by the detectives, but by the Division of Youth and Family Services. Dad can do that himself. He could have filed and asked DYFS to conduct an investigation, but the court is gonna order that dad get a psychiatric evaluation before he gets any more child parenting time.

Notwithstanding the deference owed to the determinations made by family judges hearing domestic violence cases, <u>Cesare v. Cesare</u>, 154 N.J. 394, 411-12 (1998), we think it plain, based on the evidence in the record and the court's findings, that the final order entered in this case cannot stand, the temporary order should not be reinstated, and the complaint must be dismissed.

23

Leaving aside the court's failure to explain how defendant's many inoffensive text messages to plaintiff and his two visits to her home and place of work, each lasting fewer than five minutes, qualified as harassment under N.J.S.A. 2C:33-4(a) and (c), the court never found defendant acted with a purpose to harass, which is, of course, fatal to a finding he committed the offense. See State v. Hoffman, 149 N.J. 564, 576-77 (1997). There is, however, yet another, completely independent reason reversal is required: "It constitutes a fundamental violation of due process to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint." J.F. v. B.K., 308 N.J. Super. 387, 391-92 (App. Div. 1998).

The trial court appears to have lost all sight that this was a hearing for a final restraining order alleging harassment on a very thin record, which it inappropriately converted into a hearing on defendant's fitness to parent his thirteen-year-old daughter, a claim not even cognizable in this proceeding, with no notice, no counsel, and no competent evidence. The final restraining order should not have been entered. It must be reversed and the case dismissed.

24

We start with familiar principles. A final restraining order may issue only if the judge finds the parties have a relationship bringing the complained of conduct within the statute, N.J.S.A. 2C:25-19(d); the defendant committed an act designated as domestic violence, N.J.S.A. 2C:25-19(a); and the "restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006).

The only offense listed in the complaint was harassment. A person commits harassment if "with purpose to harass another, he (a) [m]akes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm"; or "(b) [s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or (c) [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(a)-(c). The trial court found defendant's conduct fell under subsections (a) and (c). Our Supreme Court has explained "[t]he statute distinguishes between 'communications' and 'language' that violate the statute

in subsection (a), and 'conduct' and 'acts' that do so in subsection (c)." State v. Burkert, 231 N.J. 257, 272 (2017).

The Court has instructed "[t]he analysis of an allegation that defendant has violated N.J.S.A. 2C:33-4(a) . . . begins with a communication that has been made anonymously, at an extremely inconvenient hour, in coarse or offensive language, or in a similar fashion." J.D. v. M.D.F., 207 N.J. 458, 477 (2011). Defendant plainly did not send his texts anonymously or in offensively coarse language, as the court observed. And although plaintiff testified defendant texted her at 4:00 or 5:00 in the morning, she also testified she was at work near the end of her shift at that time. Plaintiff did not testify, and the court did not find, that defendant texted her "at extremely inconvenient hours." Thus, to establish harassment, plaintiff needed to prove by a preponderance of the evidence, id. at 474, that defendant's texts in some "similar fashion" were likely to cause plaintiff "annoyance or alarm" under the catchall provision of subsection (a), id. at 477.

Although the Court has held that "annoyance" is to be given its ordinary meaning of "to disturb, irritate, or bother," Hoffman, 149 N.J. at 580, it has also construed the language of the catchall provision "as encompassing, 'for constitutional reasons, only those modes of communicative harassment that

26

"are also invasive of the recipient's privacy,'" Cesare, 154 N.J. at 404 (quoting Hoffman, 149 N.J. at 583) and that constitute threats to safety," Burkert, 231 N.J. at 278.  See Hoffman, 149 N.J. at 583 (explaining that because the three types of proscribed communications in subsection (a) — those sent anonymously, or at an extremely inconvenient hour, or in offensively coarse language — are properly classified "as being invasive of the recipient's privacy," the Legislature must have likewise "intended that the catchall provision of subsection (a) encompass only those types of communications that also are invasive of the recipient's privacy").

Although the trial court found some of defendant's forty-nine texts over the sixteen days, which he did not identify, "were clearly annoying," (after previously noting defendant's texts were not disparaging and were "inadequate"), the law is settled that speech that doesn't invade a plaintiff's "privacy by its anonymity, offensive coarseness, or extreme inconvenience does not lose constitutional protection even when it is annoying."  Id. at 583-584.  See Burkert, 231 N.J. at 283 ("We cannot say that the Legislature intended to criminalize speech that poses no threat to a person's safety or security or speech that does not intolerably interfere with a person's reasonable expectation of privacy.").

"Because subsection (a) has criminalized communications that are made anonymously or in offensively coarse language or at extremely inconvenient hours," the Court has reasoned "that the Legislature did not intend to criminalize communications under subsection (a) that are made in inoffensive language, at convenient hours, or in the communicator's own name."[7] Hoffman, 149 N.J. at 584. Thus, defendant's forty-nine texts over sixteen days, made in inoffensive language, not at inconvenient hours to plaintiff and in his own name, cannot qualify as harassment under subsection (a), leaving aside whether he intended them to annoy plaintiff, which the court failed to find in any event.[8]

---

[7] There is no question, however, but that "conduct or speech that may not sufficiently constitute an invasion of privacy to the non-victim, may in fact constitute harassment to the victim of past domestic abuse." Hoffman, 149 N.J. at 585. The principle is not applicable here as plaintiff has never alleged defendant committed any past act of domestic violence against her over the course of their nearly fifteen-year relationship.

[8] Although plaintiff answered "yes" to the court's leading question "[s]o the text messages were annoying to you," during her own narrative testimony she repeatedly stated only that defendant "sent so many text messages [she] just stopped reading" them. Plaintiff never testified the texts were disturbing, irritating, or bothersome. Indeed, plaintiff never testified that she asked defendant to stop texting her, as one might expect of one who found the texts bothersome — as opposed to simply not worth her time to read.

Whereas a violation of subsection (a) of the harassment statute can be satisfied by proof of a single communication, so "long as [the] defendant's purpose in making it, or causing it to be made by another, was to harass and as long as it was made in a manner likely to cause annoyance or alarm to the intended recipient," a violation of subsection (c) "requires proof of a course of conduct." J.D., 207 N.J. at 477-78. The Court has explained a course of conduct "may consist of conduct that is alarming or it may be a series of repeated acts if done with the purpose 'to alarm or seriously annoy' the intended victim." Id. at 478. "Serious" annoyance in subsection (c) "means to weary, worry, trouble or offend." Hoffman, 149 N.J. at 581. The difference between "annoyance" and "serious annoyance" is thus only one of degree. The Court has explained "[t]he purpose of subsection (c) is to reach conduct not covered by subsections (a) and (b)." Id. at 580.

It is difficult to conceive how the addition of defendant's two visits to plaintiff's home and place of work could convert defendant's series of non-threatening text messages, not actionable under subsection (a) as a matter of law because categorically not "likely to cause annoyance or alarm" under the circumstances, into a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person"

29

under subsection (c). Plaintiff conceded defendant drove by her home once and her workplace once, and that each visit lasted no more than five minutes. She also conceded defendant texted her before coming to her house on January 7, stating "I would like to try to pick up my kids in a civil manner."

And although plaintiff testified she didn't know why defendant was taking pictures or a video of her house and workplace, he explained at the hearing that he was doing so "to document for court documentation purposes" her correct address and the fact that she was working in anticipation of their upcoming support and custody hearing because plaintiff had recently moved to a new home and "wasn't coming forth" with her home address or where she was working.[9] Plaintiff did not dispute defendant's allegations, and the judge found only that defendant's efforts were "totally unnecessary" and "an annoying type of conduct," not that the conduct was "seriously annoying" or that defendant acted with a "purpose to alarm or seriously annoy." N.J.S.A. 2C:33-4(c).

Criminal harassment is a specific-intent offense. A finding the defendant acted with a purpose or intent to harass the plaintiff "is integral" to a

---

[9] Defendant testified plaintiff "didn't disclose where she worked [in the custody and support case] until January 17th and that was only in response to [his] lawyer['s]" demand.

determination of harassment.  Bresocnik v. Gallegos, 367 N.J. Super. 178, 183 (App. Div. 2004).  Under our criminal code, "[a] person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result."  N.J.S.A. 2C:2-2(b)(1).  Although "[a] finding of a purpose to harass may be inferred from the evidence presented," informed by "[c]ommon sense and experience," Hoffman, 149 N.J. at 577, no such inference can be drawn here. There is simply no credible evidence in this record to support a finding the trial court never made — that it was defendant's "conscious object . . . to alarm or annoy."  J.D., 207 N.J. at 487.  Plaintiff's "subjective reaction alone will not suffice; there must be evidence of the improper purpose."  Ibid.

Defendant explained why he took a video and pictures of where plaintiff lived and worked.  Although the judge rejected his efforts as "strange" and "totally unnecessary," defendant testified he didn't know it was unnecessary. Defendant offered to allow the court to view the videos on his phone, and no use for them other than the one testified to by defendant was suggested by the record.  Plaintiff didn't dispute that defendant had only once driven by her home and once by her workplace, notwithstanding the avowal in her complaint that defendant had been "driving by her place of employment and residence at

31

all hours of the day." There is simply insufficient evidence in the record to permit a finding that defendant acted with the "conscious object" to engage in a "course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy" plaintiff so as to constitute harassment under the Prevention of Domestic Violence Act. N.J.S.A. 2C:33-4(c).

We can well understand how her sister's tragic death as a victim of domestic violence could cause plaintiff not to "take this matter lightly" and "just want[ing] to be sure" she "took the right precautions." But that cannot form the basis for a domestic violence restraining order against defendant. See R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) ("a plaintiff's subjective reaction to the conduct, standing alone, is insufficient to establish a defendant acted with improper purpose").

Likewise, notwithstanding plaintiff's concern that defendant's conduct had "escalated" after she ended his weekly overnights with the children over the Christmas holidays, "[t]he law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of violence between the parties including previous threats, harassment and physical abuse, and in light of whether immediate danger to person or property is present." Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995).

A-1791-22

There was no history of domestic violence between these parties. Defendant had never threatened, harassed, or physically abused plaintiff at any time in the past, and he did not do so here. Defendant's conduct thus cannot be fairly characterized as "escalating."

A judge's finding of an act of domestic violence, of course, is only the first of a two-step process; the second step requires a finding that a restraining order "is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. The court's focus here, however, was not on danger to the victim, that is, to plaintiff, but on danger to the parties' thirteen-year-old daughter. That was clear error and provides an independent ground for reversal here.[10] See M.A. v. E.A., 388 N.J. Super. 612, 620 (App. Div. 2006) (holding the Prevention of Domestic Violence Act does not allow a parent, acting in effect as a guardian ad litem, to obtain a restraining order on behalf of a minor child).

---

[10] The judge stated he was "aware that one of the six criteria under the Silver Part Two is concern for protection of the children, so I consider this to be something of concern." Although the judge was correct that "[t]he best interests of the victim and any child," N.J.S.A. 2C:25-29 (a)(4), is one of the six factors listed in N.J.S.A. 2C:25-29 a court may consider, that factor, like "[t]he financial circumstances of the plaintiff and defendant," N.J.S.A. 2C:25-29(a)(3), is "relevant only to the fashioning of a domestic violence remedy," not to whether the defendant committed an act of domestic violence. Cesare, 154 N.J. at 401.

Plaintiff's complaint makes no mention of any concern for the parties' two children or any dispute over a camera. Nor did plaintiff bring up either in her initial presentation to the court at the hearing. Plaintiff claimed that defendant's texts and videos of her home and place of work started after she filed a motion for child support. The texts, however, do not appear to refer to child support, but instead relate entirely to plaintiff's refusal to allow defendant to see the children.[11] The issue of the camera came up only after defendant testified the children stayed with him three nights a week, and his forty-nine text messages were sent after she abruptly changed their arrangement over the Christmas holidays with no explanation to him.

It was only after the judge asked plaintiff "is it true that the defendant had regular parenting time until December 19th," that plaintiff raised the incident of the prior July to explain why she had recently refused to allow defendant to see the children. Instead of recognizing that plaintiff's report of her daughter's statement was inadmissible hearsay under N.J.R.E. 802 not

---

[11] The only oblique reference to child support in the texts mentioned at the hearing was one from January 8, after plaintiff obtained the temporary order, in which defendant expressed the opinion that keeping the children from him would not "bolster [plaintiff's] case in any way." None of the texts were admitted into evidence. The only ones available to us are those read into the record.

A-1791-22

subject to any exception; that plaintiff admitted the child had not accused

defendant of any inappropriate conduct ("She didn't — she just said — and the

only thing she said was it was a couple of nights she woke up and her bra strap

was unfastened."); that the children had continued to have overnights with

their father three days a week through December 19; that the issue of the

camera was not relevant to plaintiff's claim of harassment, see M.A., 388 N.J.

Super. at 619-20 (holding the defendant's alleged sexual abuse of his minor

stepdaughter could not, as a matter of law, "qualify as actionable 'harassment'

against the plaintiff" mother); and that defendant had no notice the issue would

be addressed at the hearing — the judge made it the focal point of his findings,

stating: "[b]oth parties admit there was a problem regarding some issue with

respect to . . . the 13-year-old daughter staying at her father's home. It is that

particular element in this case that seems to be developing into a substantial

problem, developing into an act of domestic violence."

The Court has been unequivocal in admonishing trial courts that a

finding of domestic violence based on an allegation not contained in the

complaint violates a defendant's right to due process. See H.E.S. v. J.C.S., 175

N.J. 309, 321-25 (2003). "At a minimum, due process requires that a party in a

judicial hearing receive 'notice defining the issues and an adequate opportunity

to prepare and respond.'" <u>Id.</u> at 321-22 (quoting <u>McKeown-Brand v. Trump Castle Hotel & Casino</u>, 132 N.J. 546, 559 (1993)). As the Court stated in <u>Nicoletta v. North Jersey Dist. Water Supply Com.</u>, 77 N.J. 145, 162 (1978) "[t]here can be no adequate preparation where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice" (quoting <u>Dept. of Law and Pub. Safety v. Miller</u>, 115 N.J. Super. 122, 126 (App. Div. 1971)). And, as already noted, Judge Skillman explained twenty-five years ago to judges hearing domestic violence matters, that "[i]t constitutes a fundamental violation of due process to convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint." <u>J.F.</u>, 308 N.J. Super. at 391-92.

Defendant was not provided any notice that the issue of the Ring camera, which was not at all relevant to plaintiff's claim of harassment, would not only become the focus of the hearing but the basis for the entry of a domestic violence restraining order that awarded custody of his children to plaintiff and suspended his parenting time pending a court-ordered psychological exam and further order of the court, notwithstanding the parties' pending motions to address support and custody in a separate, already-scheduled proceeding.

Although "enforcement of due process does not depend on guilt or innocence," and "[t]he procedure employed here 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process,'" H.E.S., 175 N.J. at 325 (quoting Estes v. Texas, 381 U.S. 532, 542-43 (1965)), defendant could certainly have mounted a successful defense to the claim had he had notice as it was not cognizable in this action. See M.A., 388 N.J. Super. at 616 (agreeing with the trial court that under the Prevention of Domestic Violence Act, the "plaintiff could not predicate her domestic violence claims on [the] defendant's conduct against her daughter, and that evidence of such conduct was not relevant"); E.K. v. G.K., 241 N.J. Super. 567, 571 (App. Div. 1990) (holding the plaintiff's disagreement over the defendant's strict treatment of a child cannot constitute an act of spousal abuse under the Prevention of Domestic Violence Act). Thus, the error cannot be considered harmless because of defendant's general awareness of how he came to employ the Ring camera when the children stayed overnight with him.

The procedural unfairness of this hearing was compounded by the court's uneven approach to questioning the witnesses. "[A] trial judge must take special care to craft questions in such a manner to avoid being perceived as an advocate for any side of a dispute." L.M.F. v. J.A.F., Jr., 421 N.J. Super. 523,

37

537 (App. Div. 2011).  Although "a judge may have to question a pro se party to elicit necessary testimony, '[t]hat should be done in an orderly and predictable fashion . . . and not at the expense of the parties' due process rights.'"  D.M.R. v. M.K.G., 467 N.J. Super. 308, 321 (App. Div. 2021) (alteration in original) (quoting Franklin v. Sloskey, 385 N.J. Super. 534, 543 (App. Div. 2006)).

Although the dispute over the camera should not have been a part of the hearing, we nevertheless find it troubling that the court never queried plaintiff about why she prevented defendant from seeing the children over the Christmas holidays, when, according to her, defendant didn't refuse to allow the camera back in his house until sometime in January.  Nor did it ask why, if defendant's refusal to allow the camera occurred on January 7, when plaintiff claimed defendant was at her house "screaming and . . . waving his court orders and . . . saying that he's coming . . . to the house to take the kids without the cameras," it wasn't included in her complaint filed the following morning.  And if their alleged dispute over the camera — which plaintiff testified was not mentioned in their many text messages because they spoke in person at the park — instead occurred on January 13, which she testified was the only time she met him in the park, the judge didn't inquire why she would agree to meet

38

there and talk with him given she'd obtained a temporary restraining order against him the week before.

We also find it troubling that while the court repeatedly chastised defendant over his failure to go to court if he was being denied parenting time, it never explained why plaintiff was free to unilaterally deny defendant access to the children ("See, here's — there's two solutions.  One, she calls DYFS [the Division of Youth and Family Services] and [it] conducts an investigation.  Or two, she doesn't give you parenting time.").  Further, in its repeated criticisms about defendant's failure to go to court to address parenting time issues, the court ignored the likelihood that defendant filed his cross-motion to formalize the parties' existing custody arrangement at his very first opportunity in light of the courts' traditional recess week between Christmas and New Year's.

There are other disturbing aspects of this record, including the trial court's focus on what it perceived to be defendant's wrongful failure to pay child support, asking defendant "[s]o for the last . . . three and a half years, you haven't sent to [plaintiff] one penny of child support," despite both parties testifying to several years of shared custody and the issue having no relevance to plaintiff's harassment complaint.  Likewise inappropriate was the court's comment that after plaintiff filed a motion for child support, defendant, "of

39

course, . . . responds by not just asking for parenting time, but moves for custody." That comment smacks of bias, particularly as defendant testified he was not moving "for custody" but only to formalize the parties' existing shared parenting arrangement, which plaintiff both acknowledged and had unilaterally altered by refusing defendant overnights with the children. The comment was not made better by the court's finding that "[p]eople have that right to ask for whatever they want in a court action, but the actions the court finds here to be inappropriate."

The issuance of an FRO, of course, "has serious consequences to the personal and professional lives of those who are found guilty of what the Legislature has characterized as 'a serious crime against society.'" Bresocnik, 367 N.J. Super. at 181 (quoting N.J.S.A. 2C:25-18). Those consequences include: barring a defendant from having contact with his children, N.J.S.A. 2C:25-29(b)(3)(b), or suspending his custodial rights to his children, N.J.S.A. 2C:25-29(b)(11), requiring him to undergo a psychiatric evaluation, N.J.S.A. 2C:25-29(b)(18), mandating he submit to fingerprinting, N.J.S.A. 53:1-15, the placement of his name on a central registry for domestic violence offenders, N.J.S.A. 2C:25-34, requiring him to report to the intake unit of the Family Court for monitoring, N.J.S.A. 2C:25-29(b)(15), and suspending his right to

own a firearm or retain a firearms permit, N.J.S.A. 2C:25-29(b), see Peterson v. Peterson, 374 N.J. Super. 116, 124 (App. Div. 2005), all of which happened to defendant here as well as the court mandating the involvement of the Division of Child Protection and Permanency. It is precisely for this reason that our Supreme Court has stated repeatedly that "ensuring that defendants are not deprived of their due process rights requires our trial courts to recognize both what those rights are and how they can be protected consistent with the protective goals of the Act." J.D., 207 N.J. at 479. That, unfortunately, did not happen here.

In addition, as we have long recognized, "familial relationships may be fundamentally altered when a restraining order is in effect." Chernesky v. Fedorczyk, 346 N.J. Super. 34, 40 (App. Div. 2001). The final restraining order certainly had the obvious potential of doing so here, given the parties' pending motions for support and custody before another judge.

When defendant asked the court after its ruling whether the judge scheduled to hear the parties' cross-motions for support and custody within a few weeks was "still gonna hear all the facts and everything and the motion of the law," the court responded that it didn't "know why the two of you got

lawyers for a custody issue when neither of you thought of getting lawyers for this issue.  That's something . . . not before me."

The trial court, instead of recognizing plaintiff's inability to establish her claim of harassment on this record and the violation of defendant's due process rights in considering a claim founded only on inadmissible hearsay, not cognizable in this proceeding, and of which defendant was provided no notice, inappropriately allowed "a problem regarding some issue with respect to . . . the 13-year-old daughter staying at her father's home" to morph "into an act of domestic violence," making a decision on custody and defendant's fitness to parent it was without evidence or jurisdiction to make.  See E.K., 241 N.J. Super. at 571.  The trial judge should have dismissed plaintiff's domestic violence complaint and allowed the parties to litigate their support and custody dispute in their pending FD matter.  The error can hardly be overstated.

The final restraining order is reversed and the case remanded for dismissal of the domestic violence complaint.  We do not retain jurisdiction.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1791-22