# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1244-23

D.M.,[1]

    Plaintiff-Respondent,

v.

T.D.,

    Defendant-Appellant.

_____

        Argued February 12, 2025 – Decided June 18, 2025

        Before Judges Marczyk and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hunterdon County, Docket No. FV-10-0189-24.

        Christopher J. Vaccaro argued the cause for appellant (Kearns Rotolo Law, attorneys; Christopher J. Vaccaro, on the briefs).

---

[1] We refer to the parties using initials to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(9).

Daniel G.P. Marchese argued the cause for respondent (The Marchese Law Firm, LLC, attorneys; Daniel G.P. Marchese, on the brief).

PER CURIAM

Defendant T.D. appeals from a November 9, 2023 Final Restraining Order (FRO) entered against him and in favor of plaintiff D.M. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. He also appeals the December 21, 2023 order denying his motions for reconsideration and for a new trial. Because the judge's findings were supported by sufficient credible evidence in the record, we affirm.

I.

It was undisputed that T.D. and D.M. were involved in a prior dating relationship until early 2023 when T.D. caused D.M. to be arrested after T.D. reported D.M. assaulted him. T.D. subsequently obtained a temporary restraining order (TRO), claiming D.M. engaged in acts of domestic violence, specifically harassment and assault. After trial, the family court granted the FRO against D.M. in March 2023.

D.M. was incarcerated on related charges between April 21, 2023 and September 13, 2023. Upon his release, D.M. obtained a TRO against T.D. on September 29, 2023, claiming T.D. was sending harassing communications to

2

him.  The trial spanned several days and was presided over by the same judge who conducted the prior hearing.  The court granted the FRO, and the following relevant facts are derived from the trial record.

D.M. testified that prior to T.D.'s obtaining the TRO against him, he lived with T.D. for "most nights of the week and sle[pt] in the same bed as him from about December [2022] until March" 2023.  D.M. explained that T.D., a lawyer, had represented him in exchange for sex.  Their relationship was volatile, and D.M. described a physical encounter with T.D. in January 2023 in which he claimed T.D. "physically assaulted" him, leaving "a gash on [D.M.'s] head."  D.M. also testified about an incident on February 15, 2023, and presented a video recording, not contained in the record on appeal, which apparently showed the two men fighting with one another for about ten seconds.

According to D.M., he was arrested after allegedly assaulting T.D., and the next day T.D. visited him, gaining access to the jail and to him by claiming to be D.M.'s attorney.  D.M. indicated that he was released but subsequently arrested and detained again in Pennsylvania pending extradition on charges related to T.D.'s allegations.  At that time, a social worker from the jail advised D.M. his "attorney was on the phone," but D.M. explained it was actually T.D. giving D.M. his new phone number and telling D.M. to "contact him."  T.D.'s

3

2

A-1244-23

number was added to D.M.'s contact list at the jail, and D.M. recalled they talked several times, T.D. gave him legal advice, and told D.M. he "miss[ed] him" and was "sorry that [D.M. was] in jail." D.M. identified the specific number T.D. provided via which they communicated, which mirrored the sending telephone number depicted in the series of text messages that followed.

D.M. recounted that T.D. began texting him from that new number, but D.M. did not see all the messages until he was released from detention on September 13. He presented over twenty messages beginning on April 6, including a text message from T.D.'s number on April 8, stating, "You are spreading lies. Stop messaging me. I now view this as harassment. Stop all contact." D.M. stated he had not messaged T.D.

D.M. also presented numerous messages from T.D.'s number after his release, including a naked "selfie of [T.D.]" "at the mirror" that D.M. recognized from T.D.'s master bedroom at T.D.'s beach house where D.M. "would sleep." D.M. testified the naked photo was sent on September 18, 2023 after he was released from jail, along with other messages through Grindr, a social networking and online dating application. D.M. identified a copy of what D.M. described as a screenshot of the message accompanying the sexual image, specifically stating, "Just let me know if you are in need of my services tonight.

I would love to get on my knees both in front of you and behind you and take care of all your needs. I can host . . . ." The message specifically offered to meet in the town where T.D.'s beach house is located.

D.M. indicated that the continued communications from T.D.'s number made him feel "[v]ery uncomfortable" and "very scared that [he] would end up back in jail" as a result of T.D.'s contacting him.

D.M. admitted he was previously "convicted in federal court of stalking," and testified that he installed cameras in T.D.'s home with T.D.'s permission. D.M. agreed that he had not obtained call records from the jail to document the early calls he allegedly had with T.D. He explained that he made calls and sent and received text messages through Google Voice and presented the texts from T.D.'s phone number to his own number via printouts from the Google Voice application, which D.M. characterized as screenshots capturing that information.

D.M.'s current boyfriend next testified about his own communications with T.D. while D.M. was incarcerated in which T.D. also provided his new phone number, which matched that on the messages. He explained that he spoke occasionally with T.D., and when he advised T.D. that D.M. was in jail in June 2023, T.D. responded, "Shall I call?"

A-1244-23

T.D. testified and denied sending any of the messages to D.M. He advised that he was fearful of D.M., who had physically assaulted him, gained unauthorized access to his bank and credit card accounts, and "hacked" into his phones, accessing his emails and social media in the past. He denied ever representing D.M. or holding himself out as his attorney. He denied that D.M. ever resided with him, indicating D.M. stayed overnight occasionally, and claimed D.M. installed surveillance cameras without T.D.'s knowledge.

T.D. admitted he provided his new cell phone number to D.M.'s boyfriend. He confirmed it was the same number from which the messages were sent to D.M.

T.D. countered D.M.'s testimony regarding the two incidents leading up to his seeking restraints against D.M. T.D. denied that he attacked D.M. in January 2023, describing that D.M. dragged T.D. from his chair and punched him, "bloody[ing] [his] face." T.D. testified D.M. then grabbed T.D.'s cell phone and iPad and ran out of the house, and T.D. locked every door and called the police after D.M. broke his front door.

T.D. also described that in February, D.M. "threw [him] down on the floor, started beating [him] on the face, bloodied [his] mouth," and "sexually assaulted [him]." T.D. then played a video recording, not provided for our review on

6

appeal or captured in the lower court transcript, purportedly capturing audio of that incident, although not capturing any images of the encounter, in which T.D. identified his own voice "yelling 'stop it.'"  T.D. testified that after the assault he ran next door to call 9-1-1 after D.M. stole T.D.'s phone and drove away in T.D.'s car, after which police again arrested D.M.

T.D. acknowledged that in seeking his TRO against D.M., and at the prior FRO trial, he never claimed to have been sexually assaulted by D.M., but explained that he did not recall the sexual assault occurring in February 2023 until hearing the audio tape, and "then it all came back like a flood."  Confirming that he went to the jail to see D.M. the day after the alleged sexual assault, T.D. explained he visited because he "felt terrible that [D.M.] was in jail because of the incident that occurred at [T.D.'s] house."  He admitted that he identified himself as an attorney when asked at the jail, but stated he never advised anyone that he represented D.M. to gain access to him.  T.D. also denied calling a social worker when D.M. was later detained for violating the FRO or engaging in telephone communications with D.M. while D.M. was detained.

T.D. next testified about the photos of messages appearing to have been sent from his Grindr account, claiming D.M. hacked all his accounts to create these messages.  T.D. explained his experience with Grindr:

A-1244-23

[T]he[ users'] names are virtually never there. They may have a fake name. They may even have fake photos. But no, their name is not there. You can ask someone for a photo and they can send you a real photo, they can send you a fictitious photo, but their name is not there. You don't know who you're communicating with. You can ask, but you don't always get a straight response.

He admitted uploading the nude photos of himself to that Grindr account, but denied ever intentionally messaging D.M. through Grindr.

After T.D. testified, the court inquired whether D.M. had testified at the prior FRO hearing. D.M. replied that he had not, to which T.D. interjected that D.M. "absolutely did" testify at the prior hearing. D.M. clarified that he did cross-examine T.D., but did not testify, explaining T.D. "testified for [fifteen] minutes before [D.M.] was in the courtroom," which he claimed he confirmed after obtaining a recording of the proceeding. Again unprompted, T.D. stated, "Let me explain what happened," representing that D.M. failed to appear at a first hearing, causing the court to adjourn the matter, after which both parties appeared and testified. The court later placed on the record that it verified D.M. had not testified at the prior trial.

T.D. next presented testimony from his nephew J.R., an FBI agent who testified as a lay witness about assisting T.D. in addressing issues with his bank and computer accounts when they appeared to have been "hacked." J.R., who

had testified at the earlier FRO trial, recalled meeting D.M. in 2022, when D.M. told him he was a "former client" of T.D.'s. He testified that D.M. told him he worked in "private cyber security, government contracts," and observed D.M. seemed to possess "a lot of knowledge about the FBI." According to J.R., D.M. later clarified he had not worked formally in cyber security, but "instead . . . work[ed] for elderly men who d[id not] know how to use computers." J.R. testified that after D.M. told him he had been investigated by the FBI in the past, he learned that D.M. had a "prior case for cyber[-]stalking."

J.R. explained that, in September 2022, he began helping T.D. to "recover[] several of his online accounts," believing T.D. to be "subject [to] some form of identity theft," but upon discovering D.M.'s past, he informed T.D. that he feared D.M. was hacking his accounts. J.R. indicated that he monitored compromises in T.D.'s accounts and claimed he related one issue to an IP address connected to D.M.'s Pennsylvania address.

J.R. also recalled finding, in March 2023, surveillance cameras placed throughout T.D.'s home and a GPS tracker in T.D.'s car. J.R. began to testify about Google searches on T.D.'s computer that he asserted did not originate from that device, but after an objection by D.M.'s counsel, the court determined J.R. could only testify as a fact witness, refusing to allow the technical testimony.

9

Finally, T.D. presented testimony from a computer forensics expert, formerly employed by the FBI, who had not examined T.D.'s devices, but did review the screenshots of the messages. He confirmed it was impossible to verify or refute their authenticity from the screenshots alone. He opined that "these documents [we]re easily editable[ and] . . . changeable," including "the times, the dates, . . . [and] the phone numbers," even by someone without experience utilizing a computer program. The expert presented fabricated messages he created to demonstrate how the content and other information can be manipulated.

On cross-examination, the expert was shown on a computer screen D.M.'s Google Voice account, and specifically, the messages D.M. allegedly received from T.D. The expert confirmed the presence of those messages in the account, agreeing they appeared to have been received by D.M. from T.D.'s number, and that the screenshot printouts offered into evidence matched what was reflected on D.M.'s Google Voice account. Nonetheless, he reiterated there is no way to confirm from the messages alone who actually sent them.

After testimony concluded, in addition to providing written submissions, both parties presented summations. D.M.'s counsel argued the evidence established the predicate act of harassment and the necessity of an FRO. He

asserted that the evidence clearly showed T.D. sent these messages to D.M., while D.M. was detained and after his release, and characterized T.D.'s conduct as "sociopathic" and "tr[ying] to bait" D.M. He argued that the record established that T.D. sent the messages, which were still available on D.M.'s Google Voice account, as verified by T.D.'s expert. D.M. further claimed T.D.'s testimony was not credible, emphasizing that T.D. had gained access to the jail to see D.M. the day after he claimed to have been violently sexually assaulted by D.M. He argued T.D. testified incorrectly in several instances, including insisting D.M. had testified at the prior FRO hearing when he had not.

D.M. contended he established an FRO was required as T.D. "does[ not] get it" and will not "leave [D.M.] alone." D.M. therefore argued an FRO was necessary as he feared T.D.'s conduct would continue.

T.D. argued D.M. failed to show that T.D. sent these messages or alternatively, if he sent them, that he did so intending D.M. would receive them or with the purpose to harass D.M. Defense counsel suggested it was "insanity" to claim T.D., a victim of D.M.'s prior abuse, would text D.M. knowing he was incarcerated at the time, emphasizing that the content of the messages did not correspond to the parties or their circumstances.

T.D contended D.M.'s testimony was incredible, highlighting that D.M. had a history of cyber-stalking and possessed "superior knowledge of technology." Having established that messaging and screenshots are theoretically easily fabricated, T.D. claimed that D.M. created or altered messages to make it appear that T.D. was contacting him "to falsely accuse him of things, including the prior representation, which never happened."

The court identified the applicable law and found D.M. established harassment under N.J.S.A. 2C:33-4(c). The court considered the evidence and its credibility assessments of all the witnesses and was "satisfied that these texts came from . . . [T.D.]'s number and came as a result from" T.D., and that "all of the messages that were sent[,] . . . point[ed] to" T.D. The court specifically found the evidence sufficiently demonstrated by a preponderance of the evidence that T.D. "sent approximately [twenty-one] unanswered texts" to D.M.'s phone between April and August of 2023, and on "September 18[], [T.D.] sent a naked picture" to D.M., asking "when the parties could meet."

The court explained its credibility assessment of the witnesses, including how it "watched the manner in which they answered questions." Acknowledging the law indicates it can infer intent to harass from the "attendant circumstances," and by "us[ing] common sense and experience," the court found T.D. committed

12

these acts "with the purpose to alarm or seriously annoy" D.M.  It specifically credited D.M.'s testimony that T.D. sent more texts to D.M. on September 26, prompting D.M. to call the police as "he felt scared and uncomfortable."

The court questioned T.D.'s testimony, calling him "very assertive," even when incorrect.  The court referenced specifically T.D.'s claiming that "he was terrified of [D.M.]" and was "bloodied, assaulted, and raped" by D.M., but chose to go to the jail the following day advising he was an attorney visiting D.M.  The court found "that whole scenario troubling given [T.D.'s] testimony," indicating the testimony "d[id not] make any sense."  The court further questioned T.D.'s credibility after T.D.'s representations and insistence to the court that D.M. testified at the prior FRO hearing when he had not.  The court stated, "I watched him.  I listened to him.  He was absolutely certain that [D.M.] testified."  The court then verified that D.M. had not testified at the prior hearing.

The court found the record did not support a finding that the messages were "hacked," noting D.M. was incarcerated for the duration of most of the messaging, and the expert testimony did not "really help" either party.  The court accepted that the messages "could be manipulated," finding that fact to be "clear enough" from the record.  However, the court found that the testimony and circumstances supported that T.D. sent them to D.M.  As to the content of the

13

messages, the court acknowledged it was unable to "really make heads or tails as to some of the statements that were made," adding, "I don't know. Maybe it means something to [T.D.]"

The court found D.M.'s boyfriend's testimony credible, and likewise determined J.R. was "a credible witness," adding "[i]t[ was] clear he[ was] [t]here in support of his uncle's case." The court noted that J.R. "believed" that D.M. "might be compromising [T.D.]'s account," and testified that he located "spy cameras" and a GPS device in T.D.'s car. The court nonetheless found the evidence established T.D. had sent these messages. The court emphasized it found that T.D. contacted D.M. by phone and also sent a naked picture of himself to D.M., propositioned D.M. sexually, and asked if the two could meet.

The court admitted it could not determine exactly "why [T.D.] harassed [D.M.]" in this way, but that did not impact the court's finding that "for whatever personal reasons, [T.D.] could not resist communicating with" D.M. The court attributed this belief to "the history and nature of the relationship between both parties." The court cited to the ten-second video showing the "parties were pummeling one another." It called this a "perplexing case," "center[ing] around . . . a love-hate relationship."

A-1244-23

The court determined the FRO was necessary, identifying the dual considerations under Silver,[2] expressly finding "credible" D.M.'s testimony that he was afraid after receiving these texts in these circumstances and receiving a naked picture of T.D. with a request to meet after having spent months in jail as a result of allegations levied by T.D. against him.

The court likewise denied T.D.'s motion for reconsideration and for a new trial. It rejected T.D.'s claims that the court "misstated the procedural, historical timeline of events . . . to [T.D.'s] disadvantage," failed to consider the content and intent behind the messages, misunderstood the technical testimony and evidence, shifted the burden of proof to T.D., and made incorrect credibility determinations.

The court declined to consider T.D.'s "new evidence," consisting of screenshots of messages admittedly sent by T.D. to a user named "At Hq," mirroring some of the messages presented by D.M. as captured from his account. T.D. was attempting to prove he thought he was sending the messages to someone other than D.M. The court explained the proffered "text messages [were] in [T.D.'s] possession from before the beginning of the trial" but he "failed to utilize them" during trial, precluding him from raising them post-trial.

---

[2] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

Similarly, the court found "[n]o circumstances indicate[d] a miscarriage of justice in this matter" to warrant a new trial. The court noted T.D. was represented by competent counsel, the court fully considered the testimony, and "gave him ample opportunity to present any and all relevant evidence and arguments."

On appeal, T.D. reprises his arguments that the court failed to appreciate the technical testimony that the messages had been fabricated, and did not appropriately analyze the content of the communications or appreciate the lack of sufficient identification of the recipient. T.D. asserts the court also improperly determined D.M. established that T.D. sent the messages with an intent to harass and that there was a history of domestic violence. T.D. argues the court failed to acknowledge that the history reflected only D.M.'s prior abuse of T.D., further contending for the first time on appeal that some of T.D.'s actions should have been considered as consistent with that of a domestic violence victim.

II.

Our review of a family court's grant of an FRO is limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). Indeed, the trial court's findings "are binding . . . when supported by adequate, substantial, credible

evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We do "not disturb the 'factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms, 65 N.J. at 484). We may review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D. v. M.D.F., 207 N.J. 458, 488 (2011). By contrast, we review de novo the trial court's legal conclusions. See T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024).

Applying the two-step analysis to determine whether to issue an FRO, "[f]irst, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Silver, 387 N.J. Super. at 125. The court must make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Second, "upon a finding of the commission of a predicate act of domestic

violence, . . . [the court must determine] whether [it] should enter a restraining order that provides protection for the victim." Id. at 126. The guiding principle is "whether a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)).

As to the first prong, a court "must consider the totality of the circumstances to determine whether the harassment statute has been violated." Cesare, 154 N.J. at 404 (citing State v. Hoffman, 149 N.J. 564, 584-85 (1997)). "This is particularly true in domestic violence cases in which a cycle of violent behavior is evident." Hoffman, 149 N.J. at 585. Harassment under N.J.S.A. 2C:33-4(c), is established "if, with purpose to harass another," an individual "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." The Supreme Court has interpreted subsection (c) to require "repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy." State v. Burkert, 231 N.J. 257, 284-85 (2017). A purpose to harass is integral to a finding of the predicate act of harassment and "'may be inferred from the evidence presented,' and . . . '[c]ommon sense and experience may

inform that determination.'" J.D., 207 N.J. at 478 (alteration in original) (quoting Hoffman, 149 N.J. at 577).

Applying these legal principles, we are satisfied the trial court did not misapply its discretion in determining T.D. sent the communications with the requisite intent to harass. The court was satisfied that the messages had not been fabricated. The record supported that finding. D.M. testified that T.D. called D.M. while he was detained and advised of his new telephone number—a number T.D. confirmed to be his—which was reflected as the sending number on the various messages placed into evidence, including a naked picture of T.D. D.M. presented evidence that the communications were sent to his Google account and at times via the Grindr application at a time when T.D. had an FRO against D.M., and D.M. was detained as a result of T.D.'s allegations against him. He also presented evidence that communications were sent upon D.M.'s release which caused him to call 9-1-1 and secure a TRO, fearing T.D. would continue pursuing D.M. with messages subjecting him to future acts of harassment and risking false claims that D.M. violated the prior FRO.

T.D. contends the court should have relied on T.D.'s testimony and J.R.'s conclusions that D.M. was capable of fabricating the messages, which was a possibility as confirmed by T.D.'s expert. He claims, based on D.M.'s history,

the court should have found D.M. manufactured or altered them in some way to implicate T.D. T.D., however, overlooks that it is not our role to supplant our judgment for that of the trial court when it is grounded in the record. We are not in a superior position to the trial court who observed T.D.'s demeanor and testimony and did not accept his testimony as credible. To the contrary, the court found T.D.'s testimony troubling and unworthy of sufficient weight to refute the physical proof of the messages and D.M.'s testimony.

Contrary to T.D.'s assertions, it is evident that the court did consider the content of the messages. It candidly acknowledged that it could not "make heads or tails" out of some of the statements, noting that they might have had some meaning lost to third parties on a cold reading of their plain text. It nonetheless was convinced by a preponderance of the evidence, based on its review of all the testimony and evidence, that T.D. sent the messages because, despite the parties' history, it concluded T.D. "could not resist communicating with [D.M.]"

The record reflected a tumultuous history that clearly included abuse of T.D. by D.M., as reflected in part by the earlier FRO entered against D.M. That history of domestic violence by D.M. did not, however, preclude the court's finding that T.D. continued, intentionally and almost compulsively, to communicate with D.M., visiting D.M. in jail after an alleged assault indicating

20

he was an attorney, calling the facility to provide D.M. with his new telephone number that corresponded with the telephone number on the series of messages that followed, and sending a seductive image and request to meet despite having obtained an FRO.

We are not persuaded that the court disregarded T.D.'s expert, when the trial court expressly found the expert credible and accepted T.D.'s contention that screenshots of messages, standing alone, cannot firmly refute or confirm whether they were potentially manufactured or altered. Here, the court did not rely on the face of the messages alone to reach its conclusions; it credited D.M.'s testimony, and T.D.'s actions, testimony, and demeanor to conclude that T.D. sent the messages. "[B]ecause an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand," Balducci v. Cige, 240 N.J. 574, 595 (2020), we see no basis to disturb the court's findings that were sufficiently rooted in its interpretation of the record shaped by its own observations of the witnesses and evidence.

We similarly conclude the record supported the court's finding prong two of Silver was satisfied, warranting granting the FRO. See Silver, 387 N.J. Super. at 126-27. The court found credible D.M.'s fear of T.D. after T.D.'s continuous

communications in the context of their tumultuous relationship and the circumstances at the time of the communications. We accept that finding as reasonably grounded in the testimony and evidence.

T.D. argues for the first time on appeal that the trial court should have considered that his conduct at times stemmed from "the well-known pattern and vicious cycle of domestic abuse." We note this argument on its face undermines his primary claim that he never sent the messages and never would have contacted D.M. Nevertheless, we acknowledge that prior abuse can often cause a domestic violence victim to remain in relationships despite repeated abuse. We do not view the trial court's findings as disregarding this well-known concept, particularly as the court presided over and entered the earlier order protecting T.D. from D.M. The court found from the totality of the record and history that T.D. needed to be deterred from contacting D.M., as T.D. could not refrain from doing so, whatever the reason. The court did not minimize the impact of the relationship on T.D. by finding the FRO necessary to prevent further contact. To the contrary, it expressly referenced "the history and nature of the relationship between both parties."

Here, the court considered credible evidence in the record, including the parties' history, to reasonably conclude an FRO was necessary to prevent future

communications appropriately viewed as harassing under the circumstances. Accordingly, we discern no abuse of discretion in the court's finding the circumstances required issuance of an FRO for D.M.'s protection.

We likewise conclude the court did not err in denying T.D.'s motion for a new trial and for reconsideration. This court "review[s] a trial court's denial of a motion for reconsideration under the abuse of discretion standard." Gold Tree Spa, Inc. v. PD Nail Corp., 475 N.J. Super. 240, 245 (App. Div. 2023) (citing Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021)). "Motions for reconsideration are governed by Rule 4:49-2, which provides that the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." Hoover v. Wetzler, 472 N.J. Super. 230, 235 (App. Div. 2022) (quoting Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015)). Reconsideration should be granted only if the court made its decision on a "palpably incorrect or irrational basis" or if the court failed to consider or "appreciate the significance of probative, competent evidence." Triffin v. SHS Grp., LLC, 466 N.J. Super. 460, 466 (App. Div. 2021) (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996)).

Our review of a motion for a new trial is equally deferential and requires consideration of "whether there was a miscarriage of justice under the law." T.L.

v. Goldberg, 238 N.J. 218, 230-31 (2019) (quoting Hayes v. Delamotte, 231 N.J. 373, 386 (2018)).  A new trial may be granted only "if, having given due regard to the opportunity of the [factfinder] to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law."  R. 4:49-1(a).

For the reasons already set forth, we discern no abuse of discretion in the court's denial of T.D.'s motions.  We are satisfied the court analyzed T.D.'s arguments under the appropriate standards and reasonably denied the requested relief.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1244-23